Handy *vs.* Collins, Ex'x.

*Art.* 93, *sec.* 250, *of the Code* ; *Brown vs. Brown*, 22 *Md.*,
103 ; *Levy and Barry vs. Levy*, 28 *Md.*, 25.

*Rulings affirmed, and
cause remanded.*

(Decided 4th May, 1883.)

JOHN H. HANDY *vs.* FRANCES C. COLLINS, Executrix
of WILLIAM H. COLLINS.

*Commissions allowed to an Executor or administrator—Appeal—
Ownership of property Assessed to pay Paving tax—Liabil-
ity for Paving tax—Debt due Testator—Executrix.*

The rate of commissions allowed to an executor or administrator by
the Orphans' Court, in the exercise of their discretion, within the
limits prescribed by the Code, (Art. 93, sec. 5,) is not a subject of
review on appeal.

A testator cannot by anything put in his will, in anywise affect the
commissions which the law allows his executor ; and where there
has been a full administration, even the Court has no power to
deprive him of the minimum amount which the law gives him.

An Ordinance of the City of Baltimore directed the repaving of a
part of Calvert street, and provided that one-third of the cost
should be paid by the City and the other two-thirds assessed upon
the owners of the property binding on the portion of the street
directed to be repaved, in proportion to the front feet owned by
them respectively. The contract for such repaving was signed on
the 27th of May, 1881, a few days before the death of the owner of
a dwelling house and lot fronting on the part of the street directed
to be repaved. The deceased devised this property to his wife,
who, as executrix, claimed credit for $100, retained for bill for
repaving Calvert street. On exception to the allowance of this
claim, it was HELD :

That ownership at the date of the contract, under which the work
of repaving was afterwards actually done, should fix the personal

liability for the tax, and as the testator was the owner of the property at the date of the contract, his executrix had the right. to retain the money to meet the paving bill.

An executrix is not entitled to commissions on a debt due her testator, and by him specifically bequeathed to her.

APPEAL from the Orphans' Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before MILLER, STONE, ALVEY, ROBINSON, and RITCHIE, J., and BARTOL, C. J., and YELLOTT, J., participated in the decision.

*Wm. Shepard Bryan,* for the appellant.

*Frederick W. Brune,* and *Stewart Brown,* for the appellee.

MILLER, J., delivered the opinion of the Court.

William H. Collins died on the 1st of June, 1881, leaving a will by which he appointed his widow, Frances C. Collins, his sole executrix. His personal estate, according to the inventory, amounted to a little over $181,000, and consisted mainly of Baltimore City Stock. Besides this he held two bonds or single bills executed to him by B. Johnson Barbour, of Virginia, the brother of his wife, one for $20,000 and the other for $6000. These were the only debts due to him, and the debts he owed were few and of small amount. By his will he gave and bequeathed to his wife the two "bonds or single bills" of Barbour, sundry legacies of stock, furniture and money, and also his dwelling-house and lot on North Calvert street. Then, after giving a number of pecuniary legacies to other persons, he devised and bequeathed all the rest and residue of his estate, to four named parties, his cousins,

of whom the appellant is one. He left no children or descendants of children surviving him. The executrix accepted the trust, gave bond, and on the 15th of February, 1882, she propounded to the Orphans' Court her first administration account. To the passage of that account the appellant interposed a number of exceptions, and from the order of the Court overruling some of these exceptions and sustaining others this appeal is taken. It becomes then our duty to consider such parts of the order as are adverse to the appellant, or of which he complains.

1st. The Court by its order allowed the executrix commissions at the rate of seven and a half per cent., and to this objection is made. The law declares that commissions to executors and administrators shall be at the discretion of the Orphans' Court, not under *five* and not exceeding *ten* per cent., (*Code, Art.* 93, *sec.* 5;) and it is clearly settled that the rate fixed by that Court in the exercise of this discretion, within the prescribed limits, is not a subject of review on appeal. *Wilson vs. Wilson,* 3 *G. & J.,* 20. While this general proposition is conceded, the appellant's counsel nevertheless contends that under the provisions of this will the Orphans' Court could not irrevocably fix the rate of commissions. In the clause of the will appointing the executrix, the testator "*asks*" the Orphans' Court to accept such security on her bond as she may be able to furnish, as he is satisfied she will faithfully settle up his estate, and in this connection, adds "and I intend she shall be allowed as my executrix *reasonable commissions.*" The argument then is to this effect:—"The testator, if he had so chosen, had the right, in view of the provision he had already made for her in his will, to determine that his executrix should receive no commissions whatever. *Code, Art.* 93, *sec.* 6; and as he could thus take away all, he could as a necessary consequence, take away any part, or limit the commissions as he pleased. Now he says he intends she shall be allowed

reasonable commissions. He knew if he said nothing that the Orphans' Court could allow commissions in their discretion. He therefore did not mean to leave the matter to the discretion of that Court. He meant that she should have a reasonable compensation for the *services,* to be determined not by discretion but by the *facts* of the case as shown in evidence; and that this *quantum meruit* is to be ascertained by the Court in the ordinary way upon testimony taken before it, and its judgment thereon is the subject of appeal and review as well as is its finding upon any other question of fact." But the answer to this argument is obvious. The section of the Code, referred to (*Art.* 93, *sec.* 6,) declares that "If anything be bequeathed to an executor by way of compensation, no allowance of commissions shall be made unless the said compensation shall appear to the Court to be insufficient; and if so, it shall be reckoned in the commission to be allowed by the Court." To bring a case within the operation of this section the bequest in the will must be expressly made to the executor, in lieu, or by way, of compensation for his services as executor, and even then the discretionary power is still left to the Court of allowing more, unless indeed the bequest should be in excess of the *maximum* limit of ten per cent. No such bequest is to be found in the will before us. On the contrary the testator expressly declares that he intends the provision made for his wife which he believed would "about fairly represent the one-half part of my net estate, shall be in full of her claim as my *widow* in and to my estate, real, personal and mixed." And apart from the provisions of this section of the Code, it has been explicitly decided that a testator cannot by anything put in his will, in any wise affect the commissions which the law allows his executor. He cannot deprive the executor of such commissions, nor cut them down, nor take away the discretion vested in the Orphans' Court. *McKim vs. Duncan,* 4

Handy *vs.* Collins, Ex'x.

*Gill*, 72; *State, use of Manning vs. Baker*, 8 *Md.* 49. In fact, where there has been a full administration, even the Court has no power to deprive him of the *minimum* amount which the law gives him; for as was said in the case last cited "the law commands an allowance to a certain amount, and it is not within the power of either Court or testator to defeat it." Nor has the doctrine of election any application here. The general rule that a man shall not take a benefit under a will, and at the same time defeat the provisions of the instrument, finds its application in cases where the will devises property of the testator to him, and at the same time devises his own property to another. *Barbour vs. Mitchell*, 41 *Md.*, 151. But as was said in *McKim vs. Duncan*, 4 *Gill*, 85, "a person by undertaking the office of executor, does not *elect*, and is not bound to give effect to all the provisions to be found in the will. Such clauses as are inconsistent with the law, which the executor is to obey, are of no validity, and constitute *no part* of the will." But again, the views we have thus expressed, proceed upon the assumption that it was the design of the testator in declaring that he intended his executrix should be allowed reasonable commissions, to take from the Orphans' Court the discretion which the law gives them over this subject. This expression, however, in the connection in which it is used, is fairly susceptible of the construction that it was simply a suggestion to the Judges of that Court, or the expression of a desire on his part, that in the exercise of their discretion they should give her a reasonable as distinguished from an extravagant or a meagre allowance. But in any view that can be taken of the case it is plain that this part of the order appealed from is not open for review by this Court.

2nd. Exception is taken to an allowance in the account of $33 paid for rent of a pew in Grace Church. The pew itself the testator devised to his wife, the executrix. With

respect to this claim we have nothing but the bill for the pew rent.   That bill is made out against Mr. Collins, and upon its face is for six months rent of the pew "in advance to Dec. 1st, 1881."   This, in the absence of other proof, authorizes us to assume that the testator rented the pew under a contract by which the rent was payable in advance according to the terms of the bill.   This being so, it is plain that in computing the time the first day of December must be excluded.   Then counting the six months back *from* that day, the bill became due and demandable on the thirty-first day of May, and as the testator did not die until eleven o'clock on the night of the first of June, it is clear this was a debt due by him in his life-time, which the executrix was justified in paying out of the assets in her hands.   We therefore find no error in that part of the order which overrules this exception.

3rd.   One Johnson, a colored man, was a tenant of a portion of the *leasehold* estate of the deceased, and exception was taken to the account because the executrix has not charged herself with the rent due from this tenant. The Court below sustained this exception and directed the executrix to charge herself with the rent actually received by her as executrix.   The objection now made is that the order should have required her to charge herself with all the rent *due* from Johnson, instead of all that she had actually *received* from him, he being shown to be amply able to pay the same, and being, in fact, a legatee under the will to the extent of $1000.   It is quite enough to say in answer to this objection (even if otherwise there were anything in it,) that there is no proof in the record that the executrix had not *received* all the rent that was actually *due* by this tenant at the time the account was propounded.

4th.   The deceased in his life used a room in his house on St. Paul street for an office.   This was also leasehold property, and forms part of the residue of his estate given

to his residuary legatees, and exception is taken to the account because the executrix has not charged herself with the rent of this office room. The proof shows that it remained unoccupied after the death of the testator. The executrix in her testimony says she put the office in condition so that it could be rented at any moment, but she had no application for it. We are clearly of opinion she cannot be held liable for the estimated rental value of this room from the death of her husband to the date of this account, simply because she did not advertise it, or employ an agent to rent it. The Court below was right in overruling this exception.

5th. Among the provisions for his wife the testator gave her a legacy of $6000 in money, "with interest from his death till paid." The same provision as to interest is attached to all the other pecuniary legacies in the will, and the principal sums so given amounted to nearly $14,000. In her account the executrix claims a credit for this sum of $6000, and also $255 for interest thereon from the 1st of June, 1881, to the 15th of February, 1882, in other words, from the death of the testator to the time of payment. Exception is taken to the allowance of this sum for *interest* upon the ground that the testator at the time of his death had over $7000 in bank, which, it is insisted, it was the duty of the executrix long ago to have applied in discharge of her legacy so as to save to the estate for the benefit of the residuary legatees the interest thereon. It was, however, no more her duty to appropriate the money in bank to the payment of her legacy than to apply it to the payment of the other pecuniary legacies, and she was clearly under no legal obligation to pay any of them even at the time she did. This account was rendered within less than twelve months after the date of her letters. The law allows to every administrator and executor the period of twelve months from the date of his letters before he can be required to render his first administration account.

*Code, Art.* 93, *sec.* 1. Payment of these legacies could not have been enforced at the date of this account, and the executrix had, therefore, committed no default of which the law can take notice, in not paying them before, and in paying interest upon them she simply obeyed the express mandate of the will. The Court committed no error in overruling this exception.

6th. The account also claims a credit of $100 for "cash retained for bill for paving Calvert street," and to this exception is taken. It appears that on the 27th of April, 1881, an ordinance was passed for the repaving of part of Calvert street. This ordinance provides that one-third of the cost of the work shall be paid by the city, and the other two-thirds "to be assessed as provided by ordinance No. 44, of 1874, upon the owners of property binding on the portion of the said street thus directed to be repaved, in proportion to the front feet owned by them respectively." The ordinance of 1874 thus referred to, requires all contracts for such work to be awarded to the lowest bidder, and then provides that *after* a contract has thus been awarded in any given case, the City Commissioner shall assess and lay a tax for the expense of the work upon the owners of property fronting upon each side of the street, and this tax is made a lien upon such property. It also further provides that *after* the contract has been awarded, the "City Commissioner shall make a correct list of the names of the persons liable to pay the tax for the same, and the amount to be paid by each person," and he is then required to deliver to the city collector a duplicate list of such persons "with directions for collecting the said tax, which shall be due in sixty days after the completion of the work and its acceptance by the City Commissioner." In the present case, the paving contract was signed on the 27th of May, 1881, a few days before the death of the testator, whose dwelling-house and lot fronted on this part of Calvert street, and the work ap-

pears to have been actually done under that contract. As already stated, the testator owned this property in fee, and by his will devised it to his wife. The question then is, did he, in his life-time, become liable to pay the cost of the paving in front of this property, and this, it must be admitted, is a question not free from difficulty. In view of the almost constant change of ownership of property in a city like Baltimore, it would be impossible to carry out such ordinances as these unless some period in the course of the proceedings be fixed upon, after which change of ownership can have no effect. Such a date must be determined, and looking to the various provisions of these ordinances and the difficulty, in this respect, attending their execution, we think a reasonable construction requires that ownership at the date of the contract under which the work is afterward actually done, should fix the personal liability for the tax, for it is by that contract that the liability to pay for the work is incurred. In our opinion, then, the persons who are owners at that time are the persons liable for the tax, and this, in the present case, would fasten the liability upon the testator. It follows that the executrix had the right to retain the money to meet this paving bill.

7th. Exception is also taken to the account because the executrix thereby claims commissions upon $26,000, the amount of the bonds of Barbour, which were specifically bequeathed to her by the will, and that raises the most important question in the case. This debt formed no part of the inventory, was never appraised, and indeed was not the subject of appraisement. It was returned as a "sperate" debt, and at the hearing of these exceptions it was shown that the debtor had, in 1878, executed a deed of trust conveying to a trustee certain real and personal property in Orange County, Virginia, to secure its payment. Proof was also offered tending to show that this property was sufficient to pay the debt. It was not

necessary to collect it in order to pay creditors, and no part of the money was ever paid to her by the debtor, or ever came into her hands as executrix, nor was a cent of it ever for a moment under the protection of her bond. She never incurred any liability whatever on account of it, and, in fact she could not have sued the debtor in Virginia to recover it by virtue of letters testamentary granted in this State. In the account she charges herself on one side with the amount of this debt, and on the other takes credit for it as specific legatee thereof. For the simple acts of returning it as a "sperate" debt, and placing the sum of $26,000 on both sides of her administration account, she claimed and was allowed commissions to the amount of nearly $2000, which to that extent diminishes the residue of the estate. This is so unreasonable, and so unjust to the residuary legatees, that it ought not to be allowed unless the law by special mandate or just construction requires or permits it to be done. But the testamentary law of the State will be searched in vain for any provision which commands or justifies such an allowance. To make this plain, a brief review of the several provisions of the testamentary law bearing upon the subject is necessary.

The only mention made of commissions is in section 5, (Code, Art. 93,) and it is there declared they shall be allowed "on the *amount* of the *inventory* or *inventories* excluding what is lost or perished." Of what the inventory shall consist and how it shall be made and returned are the subjects of minute and special directions. It is made the first duty of an administrator or executor, after obtaining his letters, to see that an inventory is taken "in order that all persons interested in the personal estate may have an opportunity of knowing as nearly as may be the amount of the same." *Sec.* 204. For the purpose of making such inventory two discreet and disinterested appraisers must be appointed by the Court "to appraise

the goods, chattels, and personal estate of the deceased known to them or to be shown by the executor or administrator." *Sec.* 205. These appraisers must act under oath, and in discharge of their duty must "set down each article with the value thereof in dollars and cents." *Secs.* 208, 209. This constitutes the inventory which the administrator is required to return within three months from the date of his letters. *Sec.* 210. In such an inventory debts due the deceased are not included, and in *sec.* 220, which defines what "shall be deemed and taken for assets in the hands of an administrator," they are not mentioned. On the contrary, his duty and liability with respect to debts are prescribed in subsequent sections. By *sec.* 221, he is required to return "a list of the debts due to the deceased which have come to his knowledge, specifying the nature of each debt, and setting down such as he shall deem sperate, distinct and separate from those which he shall deem desperate or doubtful." By *sec.* 222, it is declared he shall not be answerable at all events for a debt which he shall return sperate, and that such return is required "merely to enable the Court and all parties concerned to form a just estimate of the circumstances of the deceased." By *sec.* 223, it is made his duty to bring suit for every debt which the Court shall not mark in the list as desperate, or improper to be put in suit, unless the debt be paid within six months after such marking, "or unless the debtor be out of the State," or unless he shall show a reasonable excuse within one month after the lapse of the six months, and for a failure to bring such suit his bond is made liable, not for the amount of the debt, but for "such damages as shall be found by the jury" in a suit thereon. By *sec.* 224, it is provided that if a debt be due the deceased by the *executor*, it shall be his duty "to give in such claim in the list of debts," and if he fails to do so a mode is provided for ascertaining the amount due, "and if the executor shall give in such claim,

or any part thereof be established as aforesaid, he shall account for the sum due in the same manner as if it were so much money in his hands, and on failure his bond may be put in suit." This makes a clear distinction as to his responsibility between a debt due · by himself, and a debt due by a third party. But to make it more plain that debts form no part of the inventory, and that ana dministrator cannot charge himself with the face amount of such debts in order to swell his commissions, it is provided in *sec.* 4, that in his first account, which must be rendered within twelve months from the date of his letters, (*sec.* 1,) he shall charge himself with the assets which have come to his hands according to the inventory or inventories returned to the Court, and that "all *moneys received for debts due the decedent* shall be included in said account." Such are the provisions and requirements of the law. Now how have they been construed by the Courts?

The case of *McKim vs. Duncan*, 4 *Gill*, 72, has been strongly relied on as sustaining this allowance of commissions. In that case the testator by his will bequeathed to his son David, (who was one of his executors,) and to his sons John and Richard, to be equally divided between them, the whole of his capital used in the copper business that may be standing to his credit, "after payment of all debts and claims upon or growing out of that business," and by his codicil he revoked the devises and bequests in favor of David, and gave the same to him in trust for his wife. From an examination of the record in that case it appears the testator was a partner with his sons in the business referred to, and in the list of debts returned by the executors, this capital is stated as a debt thus: "David T. McKim and John S. McKim, surviving partners of John McKim & Sons, for amount of capital of late John McKim, Jr.," (the testator) "in Copper Co., subject to bad debts and collections, $99,025.85." In their first account the executors charge themselves with this sum,

Handy *vs.* Collins, Ex'x.

"being the amount of the decedent's interest in the firm of John McKim, Jr. & Sons as returned in the list of debts due to the deceased," but in their second account they take credit therefor upon the ground that the firm "was not yet settled up and the actual amount due to the deceased for his interest in said firm is *not yet received."* In their third account, rendered some time thereafter, the same amount is restored, and the executors again charge themselves with it. There is enough in the record to show, or to warrant the inference, that between the date of the first and third accounts David T. McKim, who was one of the surviving partners, as well as one of the executors, settled up the business of the firm, ascertained the amount due his testator, and actually received it, or had it under his control; and it is beyond dispute that he paid it over to the legatees respectively and took their several releases therefor. In allowing the executors commissions on this sum the Court of Appeals evidently considered it as a debt actually collected and received by one of them, and paid over by both to the legatees named in the will and codicil. This is manifest from what is said upon the subject in the Court's opinion. "The *money,"* say the Court, "was unquestionably a part of his personal estate, and *when paid to them* (the executors) constituted a part of the assets in their hands to be by them accounted for in their settlements with the Orphans' Court; the testator could not by his will prevent the executors from *collecting* and accounting for this portion of his estate, or authorize any other person *to receive* it from the debtors." The most that can be made of this decision is that it authorizes the allowance of commissions on *money* actually collected and received by an executor on account of debts due the testator and which he disburses in payment either of the claims of creditors or legatees. Viewed in this light the decision does no violence to the provisions of the testamentary law referred to, but places a reason-

able construction upon them; for if an executor receives; or collects money on such debts his bond immediately becomes responsible for its safe custody and due application as directed by the law or the will, and it is reasonable he should be allowed for such services and liability. But in the present case the facts are very different. There is. here no pretence or ground for assuming that the executrix had ever received or collected any money whatever on account of this Barbour debt.

The case of *McPherson vs. Israel*, 5 *G. & J.*, 60, is also relied on by counsel for the executrix. In that case the question immediately before the Court was, what commissions should be allowed an administrator who had died before completing his administration, but in the Court's opinion the remark is made that "the inventory of the deceased's estate, and in an enlarged construction of this, all the assets *accounted for* by the administrator, is the true standard by which to ascertain the commissions." But by this the Court surely did not mean to say that an administrator can charge himself in his accounts with debts returned in the list of debts, and receive commissions on the amount appearing due on their face. It is hardly possible to conceive that the Court intended so to construe the law, or to lay down the doctrine that debts thus treated were "assets accounted for by the administrator," so as to become the basis for an allowance of commissions, whether they were ever actually collected or not. If that were so the doctrine would apply to doubtful and desperate as. well as to sperate debts, and by this process of administration many solvent estates would be made bankrupt to the great prejudice of creditors as well as of legatees or distributees. It is evident no such construction can be placed upon this expression of the Court in that case.

In the more recent case of *Stratton's Estate*, 46 *Md.*, 551, the appraisers returned thirteen railroad bonds for $1000 each "at their face value, we having no means of

ascertaining their market value." They were embraced in the inventory, and the administrators, in their first account, charged themselves with the bonds, and claimed and were allowed commissions thereon at their face or par value. A second account was also passed in which this allowance was recognized ; but afterwards, upon objection made by a party interested in the distribution of the estate, this Court held that it was manifest error to allow commissions on those bonds at their par value ; that they had not in fact been appraised and could not, as they stood in the inventory, be considered as forming such part of it as required the Court to allow a commission upon them under the 5th section of Art. 93, of the Code ; and that the Orphans' Court was right in directing another warrant to issue for their appraisement, and reserving the right of adjusting, upon the passage of their final account, the amount of commissions to be allowed the administrators upon them. In this case the inventory itself was looked into for the purpose of detecting and eliminating from the administration account an unauthorized allowance of commissions. And it is a very strong authority to show how far the Court is inclined to go in keeping commissions strictly within a proper construction of the law. It shows that an administrator cannot, simply by charges against himself in his accounts, obtain commissions which the statute does not allow.

It seems, then, that the allowance to the executrix of commissions on the face amount of these Barbour bonds is not authorized by any provision of the testamentary law, as construed by the decisions of this Court. If the exigencies of the estate had required their collection in order to pay creditors, or general pecuniary legacies, it would have been her duty to have brought suit upon them, if the debtor had resided in this State, and her bond would have been responsible for the faithful performance of that duty, as well as for the safe-keeping and

proper disbursement of the money collected.   In that case she would have been entitled to commissions, but only upon the amount actually collected and received by her, though that amount might have been but a small part of the sum due by the debtor.   Where there is a specific legacy of a personal chattel the case is different.   The chattel has a market value, is the subject of appraisement, is required to be appraised, and properly forms part of the inventory of the estate, upon the amount of which the law expressly declares commissions shall be allowed.   Moreover, the executor's bond is responsible for the safe custody of the chattel until he gives his assent to the legacy and passes it over to the legatee.   Bonds and obligations of the United States, and of the several States, as well as of corporations, municipal or private, which are payable to bearer, and pass by delivery, and have a market value, are also properly appraised and go into the inventory. The same thing may be said of shares of stock in banks and other corporations, but a bond or note for the payment of money, given by an individual to the testator, is simply a *debt,* in respect to which the duties of the executor, as already shown, are specially defined by distinct provision of the testamentary law.   Such debt has no market value, is not the subject of appraisement, and constitutes no part of the inventory.   But upon money received by the executor, or collected by him from such debts he is entitled to commissions, as was decided in the case of *McKim vs. Duncan.*   Money thus received or collected is placed on the same footing, with respect to commissions, as money in bank or in the possession of the deceased at the time of his death, or as money received by an administrator for land sold by the decedent and conveyed by the administrator after his death, which he is required to return as a separate debt due the estate of the decedent.   *Code, Art.* 93, *sec.* 226.   As was said in the case of *McPherson vs. Israel,* an enlarged construction of the term "inventory"

properly includes such money as "assets accounted for by the administrator." But where there is a specific bequest of such individual bond or note, the sole duty of an executor in regard to it, where the money due upon it is not needed for other exigencies of the estate, is to give his assent to the legacy and deliver the instrument to the legatee. By such assent and delivery the legatee is vested with the right to sue upon the obligation in his own name. A bequest by the obligee, of a single bill, is an inchoate transfer of the bill in writing by the person authorized to make it, and when that transfer is perfected by the assent of the executor, there is a complete assignment of the same under sec. 1, Art. 9, of the Code. *Kent vs. Somerville,* 7 *G. & J.,* 265. Here there was not only a specific bequest of such bonds, but it was made to the executrix herself. There is nothing in the law, nor in any decision construing it, which justifies the allowance to her of commissions on the amount represented by these bonds, and it follows there was error in that part of the Court's order which overrules the first exception to the account. In other respects the order will be affirmed. The account must be corrected by striking out the commissions on the $26,000. Each party will be required to pay his own costs both in this Court and in the Orphans' Court, and the remanding order will so provide.

*Order affirmed in part, and*
*reversed in part, and*
*cause remanded.*

(Decided 19th June, 1883.)

The following dissenting opinion was filed :

STONE, J.—I feel constrained to differ with some of my brethren, as to the allowance to the executrix of the commissions on the specific legacy bequeathed to her by the will of the testator. I think she is entitled to the commissions

allowed by the Orphans' Court on the notes of Barbour for the following reasons:

The whole theory of our testamentary law relative to commissions to be allowed executors or administrators, proceeds upon the assumption that the, settlement of the decedent's estate is work and labor performed after his death by his executor or administrator. This work and labor is often arduous and responsible, and therefore the law has fixed upon a reasonable compensation therefor. The law has.laid down the rules for the settlement of all estates, and has fixed the compensation for so doing, and as the rights of others, the creditors, as well as the heirs and devisees are involved, it does not permit this compensation to be under the control of a testator, but wisely leaves it to the Orphans' Court. The law says in effect that the settlement of an estate is a necessary work, and as such shall be adequately compensated, and therefore does not allow a testator to deprive the laborer of his wages. I speak of course of those cases where no adequate compensation is bequeathed for doing this work; in all other cases this compensation is not and should not be under the control of. the testator. This compensation has been fixed as a commission on the amount of the personal estate that shall come into the hands of the executor, and for. a complete administration the commission varies between five and ten per cent. When, therefore, the executor has fully completed his trust, he has the right to call upon the Court for his full pay, and this the Court within the above limits has no right to refuse him; and the next question is upon what basis this commission should be allowed?

This commission is allowed upon the actual value of all the personal property of the decedent that is fully administered. This actual value is ascertained by an appraisement of all the goods that are now properly appraiseable. Most of the public securities, such as government,

railroad or corporation bonds or stocks, have now a known market value and and are easily appraised, and their real value as readily ascertained as the value of a horse or any other specific chattel. Upon their actual value so ascertained the executor is entitled to his commission and not upon their face or par value. Some are above and some are below par, but it is only upon their intrinsic value that the commission is allowed.

The actual value of private securities is not so easily come at. They have as a general rule no market or ascertained value, and are therefore generally collected by the executor. The amount of the private security collected by the executor generally furnishes the basis of his commission on that particular debt. As a general, but not universal rule, he has no other means of ascertaining its value. When its value is so ascertained he has the same right to commission on it, as to any other personal property of the deceased. When so collected the executor can only use the money for one of two purposes, that is, either to pay the debts and expenses of the estate or pay it over to the legatee. If not required for the debts and expenses it goes at once to the legatee.

But suppose the money is not required for debts and expenses and the legatee is willing, nay anxious, to receive the bond or note, and not compel its collection, but on the contrary much prefers the debt to stand invested where the testator placed it, is there any reason in law or equity why the legatee should not be gratified? Why should an executor be compelled to incur the expense, trouble and delay of resorting to legal process to accomplish what no one wants? There can be but one answer to this, and that answer must be that he need not collect the money unless the rights of others, besides the executor and legatee, would be thereby affected. In this case the only persons whose rights could be affected, other than the legatee and debtor, were the residuary legatees, and

upon this question they were entitled to be heard, and were heard before the Orphans' Court.

No one could for a moment contend that an executor was entitled to commission on the face value of a worthless piece of paper. Such an allowance would be a *fraud* pure and simple. It would be against the letter and spirit of the testamentary law; and it would apply equally to public as to private securities; it is the real and actual, not the face value of securities that is the true basis of commission. In this case the Orphans' Court did take testimony as to the real value of the bonds, as they ought to have done, and that testimony I think conclusive that they were good and that every dollar could have been collected. If the sworn return of two appraisers is always taken as a criterion of value of public securities, why cannot the sworn testimony of witnesses be taken and considered in fixing the value of private securities, and more especially when such witnesses are cross-examined and the grounds of their belief thoroughly tested.

The specific legacy of a bond or note, is a specific legacy of the *money* secured by such bond or note. The piece of paper upon which the bond or note is written is worthless. The amount collected or collectable on it, is the basis of commission. If the bonds of Barbour were not worth their face value, commission on their face value should not be allowed.

I know of no exception to the rule, that an executor is entitled to commission on *all* the assets of the estate which he fully administers. By the term assets is meant the actual, not fictitious, value of every species of personal property which comes into his hands. This value can be ascertained in several ways. It may be ascertained by appraisement, which, at most, is *ex parte* proof. Or it may be ascertained by public sale, or it may be ascertained upon the testimony of witnesses duly summoned, sworn and examined and cross-examined by the parties interested.

The last mode of ascertaining the value of property is frequently resorted to in the district where I reside, to correct the appraised value, where no sale is necessary, and where any party interested believes the appraisers have made a mistake. Such method of ascertaining the actual value is often resorted to, and is entirely unobjectionable.

I assume as a general proposition that an executor is as much entitled to his commission on a specific legacy as on any other part of the testator's estate. If this were not so, a testator could by specifically devising, deprive the executor of the whole of his commissions which the law says he shall not do.

There is no distinction made in the testamentary law in this respect, between a specific legacy to the executor and one to a stranger, unless the legacy to the executor is by way of compensation for his commissions. Certainly no exception has been made by our testamentary system between a specific legacy to the executor and one to a stranger. He, the executor, can pay over to the stranger legatee a bond or note specifically bequeathed to him, without collecting it, if it is so agreed. Why can he not do the same with his own specific legacy? The executor has no right to charge himself with the face value of a *worthless note* specifically devised to a stranger, pay it over to him, and get a commission on it. The residuary legatee has the perfect right to prove the fact that the note was *worthless*, and have the commission thereon disallowed. He has the same right to do so with the executor's specific legacy. The remedy against the fraud is ample in either case. To decide that a bond *proven to be good*, should not be taxable with commissions, because the commissions would come out of the residuary legatee, would be contrary to the whole tenor of the practice and decisions in this State. Unless otherwise provided in the will, the executor's commissions always are paid by the residuary legatee.

But if I read aright the case of *McKim* in 4*th Gill*, the very identical question now in controversy was there settled. The primary question in that case was the right of a testator to deprive his executors of their commissions, but there were several other questions raised, elaborately argued and settled. By reference to the petition filed against the executors, and which will be found on page 74, it will be found that the residuary legatees especially excepted to the allowance to the executors for commissions on the interest of the testator in certain copper works, *because the amount was never actually collected but only charged and credited.* This is not denied by the answer found on page 75. In the argument of the case it was strenuously insisted by the counsel for the petitioners, the residuary legatees, that the executors should not be in any event allowed commissions on testator's interest in the copper works because the evidence showed that the executors *never did actually collect or reduce* the money into their possession. *See page* 83. In the third account of the executors they thus charge themselves with the $99,025,85, the amount of said interest:

" With the amount of the capital of deceased used in the copper business, standing to his credit after the payment of all debts and claims upon and growing out of that business, and being the same amount as returned in the list of debts." (See original record.) This sum was also bequeathed to the executor David in trust for his wife, and David was also a partner in the copper business.

I think it conclusively shown by the foregoing facts, that the executors never did collect or receive one cent of this money, but that the amount was only transferred to his credit on the books of the concern. To have taken so large an amount out of the business might have resulted in its ruin.

Upon these facts the Court, after deciding the main question in the case, that the testator could not deprive

his executors of commissions, says: "The money was unquestionably a part of his personal estate payable only to the executors, and when paid to them, constituted a part of the assets in their hands to be by them accounted for in their settlements in the Orphans' Court. The testator could not by his will prevent the executors from collecting and accounting for this portion of his estate, or authorize any other person to receive it from the debtors."

The Court by this opinion places the right to commissions upon the right to collect, and which right of collection could not be taken away by the testator. No question whatever was raised in that case as to the solvency of David and John S. McKim who owed the money, and it appears to have been conceded that they had not paid it to their father's executors. The Court never intimates that the money must be actually collected, but places the right of commissions upon the right of collection, and properly so. I cannot presume that in rendering that decision the Court overlooked the fact patent upon the face of the proceedings, that the money had never been actually paid, more especially when that fact was pressed before them in argument by very eminent counsel. I rather assume that the Court did not deem it necessary to say anything about so plain a proposition, that if the legatee was willing to receive the evidence of debt from the executors, that it was the same as if he received the debt itself.

I am unable to see the difference between that case and the one at bar. It makes no difference, as far as the allowance of commissions is concerned, whether the property be devised specifically or generally. The executor is entitled to the same commissions on a specific as on a general legacy. Nor does it matter *to whom* the property is bequeathed, whether to the executor or a stranger. The amount of his commissions depends upon the value of the property that he administers, and not upon the character

of the legacies or legatees. If the executrix in this case had gone on and collected the note of Barbour, her right to commissions on it could not have been even questioned, although she had the next day loaned him the money again. What possible difference in principle can it make, if she proves that the note was good and collectable, but that she preferred the money to remain invested as it was.

If it is decided that an executor should not be allowed commissions on a debt specifically devised to him, unless he actually collects it, it seems to me that it must be followed by deciding that he is entitled to no commissions on any private security, no matter to whom specifically devised, unless he actually collects the money. The legatee may be willing and anxious to take the debt as it stands, and it may be ruin to the debtor to be compelled to pay within the time limited for the settlement of the estate, and it may be *conclusively proved* that the debt is good, yet the executor must abandon his commissions or collect the money.

I must therefore dissent from that part of the opinion of the Court which refuses to allow the executrix commissions on the debt of Barbour.

RITCHIE, J.—I concur in the dissent; and it may be further observed, that, in fixing the per centage of commissions, within the limits prescribed by the statute, the Orphans' Court properly looks to the nature of the executor's labor and services as to the whole estate; and the fact that but little trouble may have been required in administering a certain portion of the assets, as for instance, in simply transferring to a legatee a security specifically bequeathed him instead of first collecting the money due upon it, is a circumstance that will be considered in connection with the executor's services in regard to the rest of the estate, in determining what will be a fair compensa-

tion for the entire administration. Herein lies the safeguard against an unreasonable allowance, whilst the basis for determining what are assets upon which the commission so reached shall be allowed is, I think, as my brother STONE has stated it.

If this were not so, it may be added, where the whole estate consisted of specific bequests, the executor could receive no compensation, although burdened with the responsibility of taking the assets into his possession and duly administering them, and having been required to furnish a bond, in double the amount of the property, answerable for his defaults.