LEE ROSENCRANS, ARTHUR ROSENCRANS, AND HARRY ROSENCRANS, PLAINTIFFS-APPELLANTS, v. WILLIAM M. FRY, DEFENDANT-RESPONDENT.

Argued February 24, 1953—Decided March 30, 1953.

Mr. *Jerome C. Eisenberg* argued the cause for appellants (Mr. *Israel Spicer* and Mr. *George Rosling,* of the New York Bar, on the brief; Messrs. *Eisenberg & Spicer,* attorneys).

Mr. *Ernest E. Roberts,* of the Florida Bar, argued the cause for respondent (Mr. *William Abbotts,* attorney).

The opinion of the court was delivered by

WACHENFELD, J. This appeal, certified by our own motion, is from two judgments entered in the Superior Court, Chancery Division. The first adjudges the defendant Fry had a right to purchase the stock in question under the will. The second determines the plaintiff Mrs. Rosencrans, the testator's widow, was not entitled to receive the dividends declared between January 20, 1949 and the date of Fry's deposit with the clerk of the court, and that Fry was not, by reason of an alleged breach of duty as trustee, liable to account to Mrs. Rosencrans for the portion of the earnings of the company allocated to 3,025 shares of stock, the subject of this dispute, accruing between the date of the testator's death in 1944 and the date of Fry's exercise of his option to buy in 1949. Mrs. Rosencrans will be referred to herein as the appellant, the rights of the other plaintiffs being governed by our decision as to her.

The facts, intelligently and logically set forth in the opinion below, will be repeated briefly so their relationship to the issues raised will be apparent.

The Monmouth Plumbing Supply Company, Inc., was incorporated in the State of Florida and engaged there in the plumbing and supply business. It was organized by the testator, Charles Rosencrans, who died a resident of Monmouth County on December 7, 1944. At the time of his death he owned 3,045 shares of its stock out of a total of 6,661 shares outstanding.

Of these, he made a gift in his will of 20 shares outright to Fry, who also held 375 shares in his own right. The testator's wife owned 181 shares, and his nephews, the plaintiffs Arthur and Harry Rosencrans, had 500 shares between them. Approximately 50 other investors were stockholders. The principal query is whether or not Fry, under the terms of the will, was given the right to purchase the remaining 3,025 shares possessed by the testator at the time of his death.

The testator was survived by his widow and they apparently had a happy and harmonious marriage. There were no children born of the union.

Fry was employed by the Monmouth Plumbing Supply Company in 1924 as an "extra man." He became manager in 1934. During the absence of Mr. Rosencrans from Florida during six months of the year, Fry managed the affairs of the company in Miami. At the time of the testator's death Fry was secretary-vice-president of the company.

The will, dated July 10, 1944, provided by its 19th clause:

"I devise and bequeath the remaining one-half of my Estate, consisting of both real and personal property, wherever the same may be situated or located, and which is not specifically disposed of herein, including all stock owned by me in the Monmouth Plumbing Supply Co. Inc., a Florida Corporation, other than the twenty (20) shares, herein bequeathed outright unto my good-friend, WILLIAM M. FRY, unto LEE ROSENCRANS and WILLIAM M. FRY, in Trust, nevertheless, on the following conditions, to wit:

That the income therefrom shall be paid to my beloved wife, LEE ROSENCRANS, until her death, at which time the said Trust shall terminate and cease and the principal of the trust estate created by this paragraph Number Nineteenth, shall be paid over, transferred and delivered absolutely and free from further trust, unto my beloved nephews, Arthur Rosencrans and Harry Rosencrans, share and share alike; provided, however, that my said nephews Arthur and Harry Rosencrans, shall not sell, hypothecate or otherwise dispose or encumber such stock of the Monmouth Plumbing Supply Co. Inc., a Florida Corporation, for a period of Five (5) years after the death of my wife, Lee, during which said period of Five (5) years, and also during the existence of said Trust, I do hereby give unto my friend, William M. Fry, the right to purchase any or all of said stock at its par value of $25.00 per share, and further, that my said nephews, Arthur and Harry Rosencrans, shall at no time after said period of Five years after the death of my said wife, Lee, sell any portion of said stock, without first offering the same for sale to the said William M. Fry, at its par value of $25.00 per share."

The decedent's widow was named executrix of the will and qualified as such on April 3, 1945, and Fry and the widow qualified on the same day as trustees of the trust created by the 19th paragraph of the will.

Fry qualified as ancillary executor in Florida. The disputed shares of stock were transferred to him in that capacity and were so held by him until, upon request made during the pendency of this litigation, they were re-transferred to the executrix.

In 1946 Fry expressed to Mrs. Rosencrans his intention to buy the shares of stock but refrained from exercising the option because of circumstances hereinafter referred to.

In January 1949 Mrs. Rosencrans, having definitely denied his right to purchase during her lifetime, Fry instituted a suit in Florida praying that he, as ancillary executor, be permitted to sell the shares to himself individually for $25 per share as provided in the will. Mrs. Rosencrans, individually and as trustee, countered by filing a complaint here in the Superior Court on February 7, 1949 alleging the situs of the trust was in New Jersey and the trust and its assets were not within the jurisdiction of Florida, and asked a restraint forbidding Fry from prosecuting the Florida suit.

Fry consented to the restraint and entered an appearance in our jurisdiction by filing an answer and counterclaim seeking a construction of the will and a judgment determining his right to buy the shares at the figure mentioned in the will. Mrs. Rosencrans moved to add herself in the capacity of executrix and to include a second count requiring Fry to make discovery and to turn over the shares of stock to the executrix. This was the time that Fry transferred the 3,025 shares over to the executrix as above stated.

At the same time Arthur and Harry Rosencrans were admitted as parties plaintiff. They had been elected to the board of directors on February 16, 1950 at Mrs. Rosencrans' request. After the testator's death the board had consisted of Mrs. Rosencrans, Fry and a Mr. Wherry, an employee of the company. However, with the election of the nephews to the board, control was given to the Rosencranses.

Pursuant to order of the court, a partial hearing was had on the sole question of whether the defendant Fry had a present right to buy the shares in question. On May 9, 1950 the court found he had such a right, but the entering of judgment was delayed to May 18, 1951 because of the judge's illness. Prior thereto, on May 29, 1950, Fry filed an answer and counterclaim setting forth the court's conclusion as to his right to buy and praying that it be adjudged he was also entitled to all dividends declared upon the shares since January 20, 1949, the date of the commencement of the action in Florida.

On January 18, 1951 a $4 cash dividend was voted. Arthur and Harry Rosencrans were not given notice of this meeting, nor did they attend. On February 15, 1951, still prior to the entry of judgment giving Fry the right to purchase the stock but after the decision thereon, another meeting of the board was held with all directors attending. It was resolved: (1) that a dividend of $10 per share be paid to the holders of record as of February 15, 1951; (2) that a stock dividend of 50% be paid to holders as of the same date; (3) that the authorized capital stock of the company be increased from $250,000 to $1,000,000 and a further stock

dividend of 300% be declared, issuable to the holders of record as of the same date. Fry and Wherry voted against the resolution.

Fry obtained a temporary restraining order from the Florida court enjoining the payment of the dividend, and the plaintiffs in this jurisdiction amended the second count of the complaint to charge Fry with a breach of his duty as trustee.

Fry then also applied in our jurisdiction for a restraining order paralleling the Florida restraint, which was granted. This restraint was subsequently dissolved upon condition that Mrs. Rosencrans deliver to the clerk of our court the 3,025 shares of stock and all cash and stock dividends thereon after February 14, 1951, to be held by the clerk until the further order of the court. This condition was complied with. Fry obtained an order permitting him to deposit $75,625, representing the purchase price of the 3,025 shares at $25 per share, the deposit being made on July 31, 1951. The subsequent trial of the case resulted in the second of the two judgments from which the plaintiffs appeal.

The appellant contends the will is ambiguous and the trust is not yet in existence within the intent of paragraph 19 of the decedent's will, as the assets comprising the intended trust *res* have not been transferred to the trustees, and the testator's death did not automatically mark the commencement of the term of the trust's existence.

In considering doubtful provisions in a will, the courts favor an interpretation benefiting kindred as against strangers. 69 *C. J.* 102 expresses it thusly:

"In the absence of an express intention to the contrary, in construing a will favor will be accorded to those beneficiaries who appear to be the natural or special objects of the testator's bounty."

In *In re Woods' Estate*, 321 *Pa.* 164, 184 *A.* 113, 116 (*Sup. Ct.* 1936), designating the rule to be of universal application, the court said:

"Where ambiguous or contradictory expressions appear in a will, the law adheres as closely as possible to the general rule of inheritance and favors the heir or next of kin in preference to strangers."

While in *Lavin v. Banks*, 338 *Ill. App.* 612, 88 *N. E. 2d* 512 (*App. Ct.* 1949), and in *Moffett v. Elmdorf*, 152 *N. Y.* 475, 46 *N. E.* 845 (*Ct. App.* 1897), the court noted provisions for the benefit of a wife should be construed liberally in her favor.

Applying the principle so enunciated, the appellant contends that under paragraph 25 of the will, giving the widow the discretion "as to what personal property shall be sold to realize a sufficient sum with which to pay the legacies hereinabove provided for," she, as sole executrix, had the right to sell the stock in the Monmouth Plumbing Supply Company in order to pay legacies and thus might have received in excess of $25 a share for it.

In paragraph 18 of the will the testator bequeathed to her one-half of his residuary estate, excluding therefrom, however, the shares of the Monmouth stock which he included in the *corpus* of the trust created for her benefit under paragraph 19. But there was a specific provision that the shares of stock which went into the trust were subject to the right to be bought by Mr. Fry at the price of $25 per share.

If the language of the will is not ambiguous and "the intention is signified by apt words and phraseology, there is no room for construction. It is not proper for the court to first determine what the will ought to be and then exercise its ingenuity in producing such a result." *Brearley v. Brearley*, 9 *N. J. Eq.* 21 (*Ch.* 1852).

The court will intervene when the will is ambiguous and its language misleading and confusing, but in the construction of wills the duty of the court is to endeavor to ascertain the intent of the testator and not endeavor to rewrite the will or make a new will adverse to the testator's intention. It is bound to ascertain and give effect to the intention of the testator as expressed in his will. *Guaranty Trust Co. v. N. Y. Community Trust*, 141 *N. J. Eq.* 238 (*Ch.* 1948).

Likewise, the intention to be sought is not that which existed in the mind of the testator but that which is expressed in the language of the will, *March v. Morristown Pennsyl-*

*vania Trust Co.*, 123 *N. J. Eq.* 282 (*E. & A.* 1938); while in *In re Fisler*, 133 *N. J. Eq.* 421 (*E. & A.* 1942), it was said the judicial interpretative function is to find the meaning of the testator as expressed in the language used and considered in the light of attending circumstances and effectuate it.

If the testator's purpose is revealed by clear and unequivocal terms, there is no room for construction. The function of the court is only to construe the will the testator has made and not to make a new will for him. *Stryker v. Sands*, 4 *N. J.* 182 (1950).

We believe the testamentary purpose of the testator here was clear and unambiguous and the intention expressed in the will contained no uncertainties or vagaries requiring the application of the canons of construction.

Outside of specific bequests to charity and friends, the testator left a very substantial part of his estate to his wife. He protected her by providing that legacies and devises for her had priority over other legacies, and then insured to her an absolute interest in one-half of the residue. It is significant also that in paragraph 18 he specifically excluded the stock owned by him in the Monmouth Plumbing Supply Company and specifically included it in paragraph 19, showing, we think, he intended his interest in the company was to remain intact so that Fry, who had worked for him over the many years, might have the opportunity, if he wished, to purchase the stock at its par value.

The identity of Fry with the corporation is further indicated by paragraph 27 of the will, directing the trustees shall, as long as they hold the stock, elect him president. It was clearly intended, we think, he should succeed to the stock interest which the testator held in the corporation. The time of his doing so is expressly provided for in the will. He had the right for a period of five years after the death of the wife "and also during the existence of the trust" to make the purchase.

We are in accord with the conclusions of the court below in this respect and our view is not altered by the fact

that the property intended to become the *corpus* of the trust was never actually transferred to the trustees.

Appellant, alluding to this fact, urges Fry did not have the right to buy the shares of stock, inasmuch as the will gave him that right during the existence of the trust and the trust did not exist. Although a testamentary trust, being created by will, cannot take effect until the death of the testator, on the other hand it must take effect at the time of his death. 3 *Page on Wills, p.* 486. The obvious intent of the testator would be defeated by giving to the words of the will so strict a construction as to require actual transfer of the property to the names of the trustees before the intended trust existed. We are not persuaded by the argument.

Furthermore, the property was never transferred by reason of the default of the appellant, Mrs. Rosencrans, as executrix. The duty to make the transfer was hers, and it does not become her in a court of equity to complain of a situation created by her own failure or to seek an advantage therefrom.

The judgment below with respect to the right of Fry to purchase the stock is affirmed, and having so concluded, we are now confronted with the remaining aspects of the litigation.

It is contended the formality of tender of the actual cash was necessary to perfect the attempt to exercise the option in the will.

██ It is true, as set forth in 52 *Am. Jur., Tender, sec.* 7, that "a mere offer to pay does not constitute a valid tender; the law requires that the tenderer have the money present and ready to produce and actually offer it to the other party." Nevertheless, by the same text, *sec.* 4:

"The familiar rule that the law does not require one to do a vain or useless thing excuses the making of a formal tender which would otherwise be required, where it is reasonably plain and clear that, if made, such tender would be an idle ceremony and of no avail, as where it appears that a tender, if made, will be refused, for some reason unrelated to the tender or its sufficiency."

We think the defendant's intention was clear and unmistakable. He wanted to exercise his right under the will and the tender of the purchase price or its sufficiency did not cause the controversy. The issue was created by the unequivocal stand of the appellant that Fry had no right to make the purchase, evidenced by her effort to enjoin him from so doing.

The formality of a tender may be waived by the conduct of the parties. *Kastens v. Ruland*, 94 *N. J. Eq.* 451 (*E. & A.* 1923); *Hy-Grade Cut Fabric Co. v. U. S. Stores Corp.*, 105 *N. J. L.* 324 (*E. & A.* 1929). We think there was evidence of such conduct on the part of Mrs. Rosencrans amounting to a waiver of the formal tender, and the trial court's finding that a formal tender would have been "a useless gesture" seems justified.

It is next insisted under the facts and circumstances of the case the defendant trustee should not be permitted to advance his personal interests at the expense of the *cestuis que trust* and that the widow's conduct was not equivalent to acquiescence.

At the close of the fiscal year 1945, after the decedent died, the corporate surplus amounted to $244,366.40. In 1949 the corporate surplus was $562,133.15, an increase of $317,766.75. Of this, $144,309.32 was allocable to 3,025 shares decreed to be sold to the defendant, and an adjustment on this sum, it is said, should have been made. It is also asserted Fry, as trustee, should have caused the corporation to declare larger dividends before he exercised the option to buy in January 1949, and his failure to do so constituted a breach of his duty as co-trustee.

Much is said about the lack of knowledge on the part of the appellant as to Fry's legal right to purchase the decedent's shares in the Monmouth Plumbing Company at $25 a share, the contention being she did not know until early in 1949 that the defendant claimed a legal right to buy.

The appellant was the sole executrix under the will and to comply with its directions and mandates, which obligations she assumed, she would have to be cognizant of its

contents. Under the circumstances, there is a presumption she was qualified in this respect when she acted as executrix. But be that as it may, she admits she read the will "in the fall of 1944," and it is not disputed that Fry spoke to her about purchasing the stock in 1946, following which she consulted her counsel, Mr. Stein, about it. Part of her testimony as to what he had advised is as follows:

"Q. You would not deny that Mr. Stein made the statement that Mr. Fry could purchase any part, any or all of that stock when he wanted to at $25 a share. A. No, I wouldn't deny it."

Mr. Stein, her counsel, declaring the question arose as to Fry's right, testified:

"I said that he had a right to ask for or demand it but I gave no opinion as to his right to have the stock. No sooner had I said that than Mrs. Rosencrans, as she was sometimes wont, got excited and said no, he couldn't have it under any circumstances, that she was interested only in what her Charlie wanted and he wasn't going to have the stock."

Fry's version of the same incident is:

"Q. Will you tell the court what happened on that occasion and what was said? A. Well, I visited Mrs. Rosencrans with the sole purpose of purchasing the stock and I made a proposition to her at that time about purchasing the stock. She didn't agree to it. She asked her attorney over the next morning. She asked him to read that section of the will and he did. She asked him if he thought I had a right to buy the stock. He said that he thought I had the right to buy the stock at any time."

Inferences are asked to be drawn because of the failure of Mr. Roberts of the Florida bar to testify. He volunteered to do so if the appellant so requested, but not being called by her, he conformed with the Canons of Professional Ethics adopted by the American Bar Association and, by *Rule* 1:7–6, made applicable to the conduct of members of the bar of this State.

In *Callen v. Gill*, 7 *N. J.* 312 (1951), referring to a lawyer testifying in court in behalf of his client, we said:

"Taken in the abstract, the practice is under emphatic condemnation."

The defendant was under no duty to advise or inform the executrix of the import of the will. The right to purchase was in plain, simple language, readily understandable by layman or lawyer. Mrs. Rosencrans was presumably keen and intelligent, having the confidence of her husband in her business ability, as evidenced by his appointing her sole executrix of his estate.

We think the record shows she was fully conscious of the provisions of the will which caused the dissatisfaction she subsequently exhibited in her reluctance to abide by the terms she disliked.

She was fully aware of the financial status and development of the corporation and its full business operations. She received monthly statements and either moved or seconded every motion for dividends concerning which she now complains. Neither as majority stockholder or as trustee did she ever object to the amount of dividends; she apparently realized large working capital was required and testified she felt the expansion program was properly and correctly financed.

Gross sales rose from $400,000 in the year of the testator's death to $2,000,000 in 1951, and net profits in the same period went from $46,000 to $215,000. Dividends increased from $1 per share in 1944 to $4 in 1948. Mrs. Rosencrans received, in addition to her salary, a bonus of $750 in 1944, and $1,202.02 in 1945. These sums were increased considerably, for in 1946 she received as a bonus $6,875 and in 1947 $7,750, $5,000 in 1948, and $4,750 in 1949.

It is fundamental that a trustee owes a duty of undivided loyalty to his *cestuis que trust*, and the doctrine maintaining the rule has often been expressed.

"It is both sound law and good morals that a fiduciary may not, in case of conflict, subordinate the *cestui's* interest to his own. Undivided loyalty is of the very essence of the relationship. The trustee is under a peremptory duty of complete loyalty and fidelity to the *cestui*. Self-interest can never be the determinative. He cannot

serve two masters in an area of service involving divergent and discrepant interests." *Camden Trust Co. v. Cramer*, 136 *N. J. Eq.* 261 (*E. & A.* 1944).

See also *In re Westhall*, 125 *N. J. Eq.* 551 (*E. & A.* 1939) ; *Taylor v. Errion*, 137 *N. J. Eq.* 221 (*Ch.* 1945), affirmed 140 *N. J. Eq.* 495 (*E. & A.* 1947) ; *Liberty Title & Trust Co. v. Plews*, 6 *N. J.* 28 (1950) ; *Bankers Trust Co. v. Bacot*, 6 *N. J.* 426 (1951).

Judge Cardozo, in the often quoted case of *Meinhard v. Salmon*, 249 *N. Y.* 458, 164 *N. E.* 545, 546, 62 *A. L. R.* 1 (*Ct. App.* 1928), said:

"A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of the courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. * * * Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. * * *"

Here, too, Fry's performance of his duties as trustee must be appraised in conjunction with the propriety of his performance as a director of the company. The conflict of interest, if any, arising out of these duties was created not by Fry but by the testator, in accordance with whose wish Fry was elected president of the corporation and by whose will he was named co-trustee. His conduct must be evaluated in the light so given.

By the terms of the trust, the trustee may be permitted to do what, in the absence of such a provision in the trust instrument, would be a violation of his duty of loyalty. *Scott on Trusts, sec.* 170.9, *p.* 871.

Fry benefited from the prosperity of the business and the expansion program, but this was primarily because of the option granted him under the will to purchase the stock at $25 a share, the price being much less than the book value both at the time the will was executed and at the testator's death, and the difference being even greater

at the time of the exercise of the option. We cannot declare Fry should not have that which the will expressly gave him, and if, under the circumstances, the trustee acted fairly and in good faith, he is not to be penalized.

"A trustee has all the powers expressly granted to him and such powers as are necessarily implied for the due and faithful execution of the trust; and where the method selected by a testator for the accomplishment of the purpose and object of the trust cannot be adopted by a trustee without dealing with himself individually, it may be fairly assumed that such dealing was contemplated by the testator." *Boston Safe Deposit & Trust Co. v. Lewis*, 317 *Mass*. 137, 57 *N. E.* 2d 638, 640 (*Sup. Jud. Ct.* 1944).

Not every duality of interest will disqualify a trustee, *Fidelity Union Trust Co. v. Guaranty Trust Co. of N. Y.*, 140 *N. J. Eq.* 548 (*E. & A.* 1947), nor do we fall within the rule enunciated in *In re Koretzky's Estate*, 8 *N. J.* 506 (1951).

It was the testator's desire to expand the business. Fry pursued the expansion program by establishing operations in West Palm Beach and Fort Lauderdale. This policy met with the approval of the stockholders, including Mrs. Rosencrans. The record indicates the cash and liquid assets were not excessive in light of the actual needs of the business and the growth experienced.

Fry's electing to exercise his option at a time when he stood to gain by his purchase, by reason of the increase in value of the shares, is not conclusive of a breach of trust. He had attempted to purchase them in 1946 before their value was enhanced by the increasing success of the business.

Mrs. Rosencrans testified she had no complaint about Fry's performance as an officer or director of the Monmouth company; he never concealed any facts from her regarding either his administration of the estate or the affairs of the company; she "never found Mr. Fry dishonest in anything he ever did," and she was "fully aware and cognizant of the manner" in which he handled her husband's estate and it was "satisfactory to her."

The court below found Fry played a difficult role occasioned by the fiduciary and business responsibilities placed upon him by the testator but could not find that he acted "with such unfairness as to prompt a court of conscience to charge him with breach of trust." We have reached a like conclusion.

The judgments are affirmed.

HEHER, J. (dissenting in part). The testator died on December 7, 1944. Defendant did not exercise the testamentary option to buy the corporate stock until January 20, 1949. Meanwhile, the defendant fiduciary was under a duty of fidelity and loyalty to the income beneficiary which precluded the subordination of her interest to his own. True, the fiduciary's duality of interest was of testamentary creation; but that circumstance did not modify the duty of loyalty so as to sanction conduct designed to serve the fiduciary's own interest at the sacrifice of the life income provided by the testator for his widow. The fiduciary was also the dominant force in the corporate management, and the income beneficiary may require him to treat the corporate transactions as though they were his own as trustee, in keeping with the standard of fairness and impartiality inherent in the relationship. Where there is manifest unfairness to the life beneficiary in the distribution of earnings for the increase of the corporate surplus to the ultimate benefit and advantage of the fiduciary who has a working control of the corporation, the fiduciary is accountable in the probate jurisdiction for the administration of the corporate affairs. Compare *In re Hubbell's Will*, 302 *N. Y.* 246, 97 *N. E. 2d* 888 (*Ct. App.* 1951). See, also, *Scott on Trusts, section* 236.11. This on the plainest principles of justice, and also to serve the testatorial intention.

The case is factually within this principle.

I do not find conclusive acquiescence by the life beneficiary in the conduct of the fiduciary in this, regard. In 1946, when the fiduciary evinced an intention to exercise the testamentary option, the widow objected on the ground that

such a course during her life would violate the testator's intention, whereupon defendant replied: "Mrs. R., if that is the way you want it, that is the way it is going to be." Mr. Stein, a New Jersey attorney retained by the widow in connection with the probate of the will, quoted defendant thus: "Let's not get excited. We are just discussing this thing. Anything you want will be done. I am content whatever you say will go." There was no contradiction of this testimony. The widow's misapprehension of the terms of the will is of no significance on this inquiry; the circumstance of major importance is that defendant indicated he would not purchase the stock against her wish. It suffices to add that defendant's own testimony demonstrates that he set the dividend policy.

I would remand the cause for further proceedings to determine defendant's accountability under the foregoing principle; otherwise, I would affirm the judgment.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN —6.

*For modification*—Justice HEHER—1.