Frances **RUSSELL**, Executrix of the Estate of Robert Marlowe Russell, Deceased, Plaintiff-Respondent-Appellant,

v.

John Paul **RUSSELL**, James B. Russell, Jr., Cecil R. Sifers and J. B. Russell, Inc., a Corporation, Defendants - Appellants - Respondents.

No. 52744.

Supreme Court of Missouri, Division No. 2.

April 8, 1968.

Motion for Rehearing, Modification of Opinion, or Transfer to Court En Banc Denied May 13, 1968.

Strop, Watkins, Roberts & Hale by Dan Hale, St. Joseph, for plaintiff-appellant.

Irvin Fane, Howard F. Sachs, Spencer, Fane, Britt & Browne, Kansas City, for appellants-respondents John Paul Russell, James B. Russell, Jr., and Cecil R. Sifers.

HYDE, Special Commissioner.

Action by executrix of estate of a life beneficiary of a trust against the trustees and a corporation in which the trust held stock (24 of 100 shares) seeking appointment of a receiver of the assets of the trust and the corporation, an accounting of the administration of the trust and its interest in the corporation, and a judgment against the trustees for $250,000.00 for profit alleged to have been made as a result of breach of trust, or for the share of income the beneficiary should have received during the term of the trust. The court entered judgment for plaintiff for $58,559.23. All parties have appealed and all say the court should not have entered the judgment it did. Plaintiff says the court should have ordered an accounting to determine the amount due. Defendants, although claiming no judgment should be entered against them, likewise say if they have any liability the amount must be determined by an accounting.

The trust was created by the Will of James B. Russell, Sr., the father of the three trustees and Robert Marlowe Russell, hereinafter called Marlowe, the beneficiary of the trust. The Will was executed August 23, 1939. Also in 1939, James B. Russell, Sr., organized the corporation involved (J. B. Russell, Inc.) and held 96 of its 100 shares. His four children, Paul Russell, James B. Russell, Jr., Cecil R. Sifers and Marlowe, each held one share and were directors with him. The first meeting of the Board of Directors was held on July 29, 1939. The corporation operated lumber yards in Lexington and Cameron. A third yard at Buckner was opened in 1941.

James B. Russell, Sr., died August 30, 1942. His Will gave each of his four children specified items of personal property and to all of them equally real estate in Oklahoma and then provided: "Item Nine: All the remainder of my property, real, personal and mixed, wherever situated or located, I give, bequeath and devise as follows: One equal part of said remainder to said Cecil R. Sifers, one equal part to James B. Russell, Jr., and one equal part to John Paul Russell, each to take absolutely and in fee simple, and one equal part to said Cecil R. Sifers, James B. Russell, Jr., and John Paul Russell as Trustees upon the following trust, to-wit: Said Trustees shall hold said one equal part of said remainder for a period ending at the death of said Robert Marlowe Russell * * * Said Trustees shall take, receive, hold, manage and control said trust property during such trust period, and shall pay to Robert Marlowe Russell annually during his life time the net income thereof. I authorize and empower my Trustees to convert any personal property they may receive hereunder into cash, and to convert any personal property they may receive hereunder into other personal property. * * * If, at the death of Robert Marlowe Russell after my death, he shall leave lineal descendants, said Trustees shall turn over to such lineal descendants any and all personal property then in such trust fund and shall also convey to such lineal descendants any and all real estate then remaining in said trust fund. If, at the death of Robert Marlowe Russell after my death, he shall leave no lineal descendants, then the property in

said trust fund shall be delivered and conveyed to such persons as, at that time, may be my heirs at law in such proportions as are provided by the law of Descents and Distributions of Missouri. * * * Said Trustees shall have the full power to vote any corporate stock that may come to them hereunder. The persons who are to take as Trustees hereunder shall, before entering upon their duties as Trustees, be appointed Trustees by the Circuit Court of Clinton County, Missouri, and give such bond as said Circuit Court may require."

The principal asset coming to the trust was the lumber company stock. The only other assets were some shares in a Cameron bank and an interest in a vacant lot in Cameron. Marlowe received the following letter from the attorney for the trustees, dated April 10, 1943, concerning his rights under the trust:

"I have examined the copy of your father's will which we have in the office.

"It is my interpretation of the will that your father left your share of his estate to your two brothers and sister as Trustees for you.

"The will provides that the income from the property which your father left you in trust shall be paid to you annually.

"Therefore, if the corporation earns and the Board declares dividends on the stock, the dividends payable on your portion of the stock should be paid to you annually. Your share of the net income from property which your father owned at the date of his death not held by the corporation should be paid to you annually. I trust this answers clearly your questions asked me at Plattsburg."

No dividends had ever been declared on the lumber company stock prior to the date of this letter. The trustees obtained an order from the Circuit Court of Clinton County appointing them trustees on January 16, 1946. They made annual settlements each year which were approved by the court 1947–1963. Marlowe died May 6, 1964, leaving no descendants. The trustees' reports to the court showed only the trust's investments and the annual income from each, all of which was paid to Marlowe. In 1964 the trust assets were the 24 shares of J. B. Russell, Inc., which had paid dividends of $720.00 in 1946 ($30.00 per share), $480, 1947–1960 ($20.00 per share), $600.00, 1961–1963 ($25.00 per share); 50 shares of Farmers State Bank of Cameron, dividends in 1963 being $48.00, and 18 shares of General Motors, dividends in 1963 being $72.00. The General Motors stock was purchased with proceeds of the sale of the town lot. These were the only assets the trust ever had. Marlowe received copies of all these reports but made no objections to any of them. No trustee's fees were authorized or paid. No dividends were declared by the lumber company prior to the death of James B. Russell, Sr., but in 1945, prior to the appointment of the trustees a dividend of $90.00 per share was declared. The company purchased another lumber yard at Atchison, Kansas, in 1947. The motion at the directors' meeting to make this purchase was seconded by Marlowe. He was the one who told his brothers this yard was for sale and went with them to look at it. Marlowe never made any objection to the accumulation of income as surplus of the corporation, the building up of its inventory or the way the corporation was being run. There was testimony that after he received the letter of April 10, 1943, from the trustees' attorney Marlowe said "he guessed he couldn't do anything about it." This evidence was offered to show his state of mind and the trustees claim it was incompetent hearsay. In any event, it seems reasonable to believe that the attorney's letter would cause such a state of mind.

Paul Russell was president of the corporation from its incorporation and was manager of its Lexington yard. Marlowe was vice president and manager of its

Cameron yard. Each received the same salary which was increased through the years from $2400.00 in 1940 to $6774.00, 1961–1963. Marlowe attended all stockholders' and directors' meetings, held annually in Kansas City, except one when the weather kept him away. The vote on declaration of dividends was unanimous at all meetings and Marlowe made some of the motions declaring them. Marlowe received copies of the minutes of all stockholders' and directors' meetings and the annual reports of the company. He never proposed larger dividends. Marlowe was in a hospital several times during his last two years but continued to manage the Cameron yard and received his salary up to the month of his death. He died at the age of 64. His widow, the plaintiff, was about six years older than Marlowe. The trustees at no time had any discussion about his rights under his father's Will. The company was in debt throughout the 1950's but sold farms it owned, about 1962, for $40,000.00 which paid its debt. Marlowe and Paul had the management of the farms.

According to the testimony of plaintiff's accountant, the company's reports showed at the end of 1942 (the year of the death of James B. Russell, Sr.) the book value of the company (net worth—difference between assets and liabilities) was $121,584.08 and at the end of 1963 was $428,956.70. Thus the book value of one share at the end of 1942 was $1215.84 and at the end of 1963 was $4289.57. The book value of 24 shares at the end of 1963 was $102,949.68. In this calculation fixed assets were shown at their depreciated value (cost less depreciation taken annually); but plaintiff claims the actual value was greater. Dividends amounted to 14.2% of profits and the increase in the book value of the shares was primarily due to retaining earnings in surplus. From the end of 1942 to the end of 1963, the amount of profits before any dividends were paid was $341,992.22. The ratio of current assets to liabilities was 7 to 1 in 1960 and 11 to 1 in 1963. The accountant said this indicated a very good financial position and that the company was being managed properly. The trial court found the corporation had an earned surplus of $323,161.86 at the end of 1963; that the earned surplus at the end of 1945 was $47,812.12 so that the profits retained by the corporation amounted to $275,329.74; and that the 24% interest of the trust was $66,079.14. However, the court allowed and deducted a trustees' fee of $7,519.91 and entered judgment for $58,559.23 with interest from date of judgment only.

Plaintiff claims the contentions made in the trustees' brief are not before this court for review because not set out with particularity in their motion for a new trial. We often have pointed out that no motion for new trial is necessary for appellate review of a case tried without a jury. See Rule 73.01(d), V.A.M.R. and cases cited in City of Mt. Vernon v. Garinger, Mo.Sup., 395 S.W.2d 214, 215. The issue on appeal in a court tried case is the propriety of the court's decision on the whole record.

Plaintiff and the trial court strongly relied on In re Hubbell's Will, 302 N.Y., 246, 97 N.E.2d 888, in which there was no income from the stock of a corporation, half of which was owned by the estate involved. The court said the trustees should have converted it into income-producing property either by selling it or by dissolving the corporation and selling its assets. Instead stock was transferred to the individual trustee (a life tenant) each year for payment of $10,000.00 each year which the Will authorized to be paid to him on his request. This reduced the estate to holding an unsalable minority interest to benefit the life tenant trustee (also a director of the corporation) at the expense of other beneficiaries. Plaintiff also cites Hillyard v. Leonard, Mo. Sup., 391 S.W.2d 211, and Garesche v. Levering Investment Co., 146 Mo. 436, 48 S.W. 653, in both of which trustees

formed a corporation to hold trust assets. In each of these cases those who controlled the corporation controlled the dividend policy of the corporation and enhanced the value of property which would ultimately benefit them as majority stockholders of the stock of the corporation to the detriment of beneficiaries of the trust provided for by the Will involved. In each case the formation of the corporation was held to be illegal and an accounting was required.

The trustees say: "The Court below erred in ruling that dividends declared by the defendant directors and plaintiff's decedent were inadequate, and in entering judgment based on the growth of the corporation through the partial retention of profits, when there was no proof or contention of abuse of discretion by the directors as such; and the Court erroneously adopted the contention of plaintiff that directors owning a majority of the stock of a corporation who are also trustees of a minority stock interest must disburse all profits of the corporation by declaring dividends for the life beneficiary of the trust, and must forego the exercise of discretion as directors." The trustees particularly rely on In re Carlisle's Will, 53 Misc.2d 546, 278 N.Y.S.2d 1011; Rosencrans v. Fry, N.J., 91 A.2d 162, affirmed 95 A.2d 905; In re Gehl's Estate, 5 Wis.2d 91, 92 N.W.2d 372; and Green v. Philadelphia Inquirer Co., 329 Pa. 169, 196 A. 32. The trustees also claim estoppel and waiver, relying particularly on Scullin v. Clark, Mo., 242 S.W.2d 542, and Coates v. Coates, Mo. Sup., 304 S.W.2d 874.

In Rosencrans v. Fry, 21 N.J.Super. 289, 91 A.2d 162, affirmed 12 N.J. 88, 95 A.2d 905, the will involved left testator's stock in a corporation to his wife and W. M. Fry, both directors of the company, as trustees of a trust estate which also included one-half of the testator's other real and personal property. The will provided that Fry could buy the stock from the trust at $25.00 per share during the existence of the trust which terminated on the testator's wife's death. The directors of the corporation were the testator, Mr. Rosencrans, Fry and an employee. The testator died in 1944 and his widow succeeded him as director. In 1949 Fry elected to exercise his option to buy. During the period the book value of the shares involved increased from $180,-884.75 to $329,725.00 ($59.79 per share to $109). The shares in the trust were less than 50% and the others were held by about 50 investors. The increase in value (1944 to 1949) was due mainly to paying dividends less than annual earnings, which was a policy the testator had followed. In affirming the judgment, the Supreme Court (95 A.2d l. c. 913) said: "Fry's performance of his duties as trustee must be appraised in conjunction with the propriety of his performance as a director of the company. The conflict of interest, if any, arising out of these duties was created not by Fry but by the testator, in accordance with whose wish Fry was elected president of the corporation and by whose will he was named co-trustee. His conduct must be evaluated in the light so given.

"By the terms of the trust, the trustee may be permitted to do what, in the absence of such a provision in the trust instrument, would be a violation of his duty of loyalty. Scott on Trusts, sec. 170.9, p. 871. * * * The court below found Fry played a difficult role occasioned by the fiduciary and business responsibilities placed upon him by the testator but could not find that he acted 'with such unfairness as to prompt a court of conscience to charge him with breach of trust.' We have reached a like conclusion."

In re Gehl's Estate, 5 Wis. 2d 91, 92 N.W. 2d 372, was a case in which the court reversed an order removing trustees because the trustees represented conflicting interests as directors of a corporation declaring no dividends. The trustees were sons of the testator and each owned stock individually and were trustees of the rest of the stock for the benefit of their three sisters for life with remainder to the sisters' respective issue. "The Will provided the stock

could be held by the trustees whether or not it complied with the rules prescribed for the investment of trust funds, and the trustees could continue in the participation and conduct of any business in which the trust held an interest." The court said: "The point of difference between the parties is whether the trustees should have caused the company to pay dividends when it made or makes profits or whether such profits should have been kept in the business for capital expansion and corporate purposes." The business was the operation of a farm. The court said: "The conflict of interest between the trustees and the beneficiaries was created by the testator. He must have realized this in providing their actions should be without impeachment excepting for lack of good faith * * *. [U]ntil there is a showing that dividends could or should have been paid by the company under sound business practices and were arbitrarily withheld by the action of these trustees, they cannot be charged with misconduct in failing to vote as directors for the payment of dividends." It should be noted that the trustees in this case were not remaindermen of the trust shares.

The trustees rely most on In re Carlisle's Will, 53 Misc.2d 546, 278 N.Y.S.2d 1011. However, the testatrix authorized retention of all investments and the individual trustee, who owned the majority of the stock of the corporation involved, was not a remainderman of the trust stock. The life income beneficiary claimed the trustee was in a position of conflict of interest and that larger cash dividends should have been declared but that the value of the trustee's stock had been increased at the expense of the income beneficiary. The shares increased in value in an eleven-year period from $3,000.00 per share to $20,000.00 per share. Dividends increased from $85.00 per share in 1954 (2.8%) to $275.00 per share in 1965 (1.4%). The court said: "that all directors exercised good, sound, independent business judgment, and that the results of the retention of the stock * * * have been beneficial both to the remaindermen and income-beneficiary and have not been to the detriment of the latter in any legal sense. While the capital value of the corpus has increased so has the income to the income-beneficiary * * *. It is just as reasonable to infer from the language of her will that she desired to benefit her grandchildren, hoping that the value of the corpus of the trust would increase, as it is to contend that she wished to sacrifice growth of corpus in favor of larger income." (278 N.Y.S.2d l. c. 1017–1018). The remaindermen were the grandchildren of the testatrix; and the court also pointed out (l. c. 1019): "In this case the trustee is not a beneficiary."

Likewise, in Green v. Philadelphia Inquirer Co., 329 Pa. 169, 196 A. 32, cited by the trustees, there was no claim, as here, against trustees who were remaindermen. The will provided for the testator's widow to hold corporate shares for life, thereafter to his son as trustee to pay one-half of the dividends to himself and one-half to his sister. On the death of the son the shares should go to his sister. The plaintiff was the brother of the wife of the trustee son to whom the son's wife left her residuary estate. This, of course, did not include the shares which had gone to the testator's daughter on the death of the trustee, her brother. Plaintiff's claim was for all of the net income of the corporation, claiming the testator's widow was entitled to the net income as dividends; that under her will such undistributed earnings passed to her son and daughter; that the son's half thereof passed by his will to his wife; and that under the son's wife's will this share passed to plaintiff. The court said plaintiff's claim that the testator gave his widow the net earnings of the corporation was untenable but that as life tenant she only was entitled to all dividends that might be declared and that if she was dissatisfied her remedy was a suit against the corporation showing abuse of discretion by the directors. In this case also, there was no issue of a trustee building up assets he would receive as a remainderman.

**478**

The Will in this case before us did not contain any provision authorizing retention of the stock of J. B. Russell, Inc., in the trust as was true in the Rosencrans, Gehl, Carlisle and Green cases. We have said: " 'In the absence of an express and sufficient authority therefor, the employment of trust property in trade or speculation, or in manufacturing, is a gross breach of trust on the part of the trustee, even though such investment is approved of by his own judgment, and is made with honest intent.' " Sebree v. Rosen, Mo.Sup., 349 S.W.2d 865, 889, citing 90 C.J.S. 516, Trusts § 324; Restatement of Trusts 2d, Sec. 227, f, Sec. 230, m; Scott on Trusts 2d Ed., Sec. 227.6, 230.4. "[W]here a testator leaves his estate in trust and the estate includes his interest in a business, whether conducted by him alone or by a firm of which he is a member, it is the duty of the trustee to withdraw the testator's property from the business, unless it is otherwise provided in the terms of the trust." Scott on Trusts, 3rd Ed., Sec. 227.6; see also Sec. 230.4; Restatement of Trusts, Sec. 230. Nevertheless the J. P. Russell Will presented the trustees a most difficult situation, due in a large part to the inadequate provisions of the Will. J. P. Russell, Inc., was a family corporation undoubtedly having no substantial market for such a minority interest. There is no evidence to show this interest could have been sold without great sacrifice of value. The trustees had no right to buy it and it is evident that neither they nor Marlowe wanted a stranger in business with them. All the evidence indicates Marlowe desired to continue as a director and the manager of one of the yards. Certainly, his actions show he did not want the corporation dissolved and its assets sold, no doubt the most practical way of realizing any amount near its actual worth. Instead he wanted the company to expand its business soon after the commencement of the trust, proposing and obtaining the purchase of an additional lumber yard. His actions and conduct speak louder than words and clearly show that he did not want the trust interest sold

and invested in something else. As indicated, it was a very successful operation and beneficial to him in employment and compensation therefor. We consider that his desires, conduct and participation in management was a material factor in inducing the trustees to keep the trust interest in the corporation. Moreover, there was no loss from the operation of the lumber company but instead a very substantial gain from a successful business and there is no evidence that a like value could have been obtained for the trust from any other investment possible from the proceeds that could have been realized from the sale of this minority interest. We conclude that on the principle of the Scullin case, 242 S.W.2d l. c. 548, not technical estoppel but on "concurrence, acquiescence, confirmation," and on laches based on his participation in management for twenty years, Marlowe could not have been permitted to make a claim based on failure to sell the trust interest in the lumber company held by the trustees or liquidate the company to reinvest the proceeds in some other securities and that his executrix is bound by this result. See Bogert Trusts and Trustees, 2d Ed., Sec. 942, Confirmation, Sec. 949, Laches; Scott on Trusts, Sec. 219, Laches; Restatement of Trusts, Sec. 219, Laches. As stated in Bogert, Sec. 949: " 'Laches is not excused by simply saying: "I did not know." If by diligence a fact can be ascertained the want of knowledge so caused is no excuse for a stale claim. The test is not what the plaintiff knows "but what he might have known, by the use of the means of information within his reach, with the vigilance the law requires of him." ' "

This leaves the issue of conflict of interest of the trustees in building corporate values they would receive as remaindermen instead of paying more liberal dividends. As to this, we agree with the trial court there is no basis for waiver or estoppel because it seems clear that Marlowe accepted and acted on the statement as to his rights to income given him by the at-

torney for the trustees (apparently also attorney for the corporation) which did not properly consider the situation actually presented. He did not voluntarily surrender a known right as to reasonable dividends and the trustee's position as to corporate dividend policy was not shown to have been based or induced by any action, representation or promise of his. No doubt, they too acted at least partially on the statement of their attorney as to Marlowe's rights to income but nevertheless acted in a way that would benefit them as remaindermen. It may be significant that the first two annual dividends declared were more than any of the later ones. The amount of dividends the trustees should have paid presents an issue that must be determined on the basis of their duties as trustees as well as their duties as directors. They could not claim a conflict of interest created by the testator as in the cases cited because the testator never mentioned the corporation or said what they should do with it. However, as the trial court said: "[I]f the trustees, each year, had paid out all of the earnings of the corporation in dividends, then the earnings in following years would not have been as large as they were   *   *   * the earnings generally were used as operating capital." In this situation, since we consider plaintiff barred from claiming all profits on the basis of an illegal investment for the reasons hereinabove stated, and with the welfare of the corporation to be safeguarded, we do not consider it was the obligation of the trustees (also directors) to pay out every cent of earnings in dividends every year. Plaintiff's counsel in objecting to testimony as to how Marlowe voted on dividends stated this was irrelevant because as a director he owed a duty to vote for the best interests of the corporation. The other directors had the same obligation but their liability in this case would be to the extent they went beyond the necessary interests of the corporation and adopted a dividend policy enhancing their own personal interests. Our view is that the amount of profits to be retained for the essential needs of this corporation for reasonable financing of its operations and the reasonable amount to be paid out in dividends is a matter that should be shown by expert testimony of accountants and corporation executives. This testimony should be based on the actual conditions of this corporation in carrying on its business, maintaining its financial position, keeping its share of the business in the areas in which it operated and preserving its values for purchasing power considering inflation of prices of labor and materials. Anything more than that would be building values in the trustees' own interest rather than the interest of the corporation and the income beneficiary of the trust. The expert testimony should be based on the actual situation, experience and prospects of this corporation. Our conclusion is that there was substantial evidence to support the court's finding that the dividend policy of the trustees as directors was improper for trustees, depriving the income beneficiary of the amount he reasonably should have received as income from the trust in dividends and building up for themselves as remaindermen greater values in the corporation at his expense. We do not agree with the trial judge's view that they should receive any amount as trustees' fees (see Vest v. Bialson, 365 Mo. 1103, 293 S.W.2d 369, 63 A.L.R.2d 504) and there should be an accounting to determine the amount that should be due plaintiff as executrix of Marlowe's estate in accordance with the principles and standards hereinabove discussed.

The judgment is reversed and the cause remanded for proceedings in accordance with the views herein stated.

PER CURIAM.

The foregoing opinion by LAURANCE M. HYDE, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.