IDA SCHOCKETT *v.* ROSE TUBLIN ET AL., EXECUTORS.
[No. 5, January Term, 1936.]

*Decided February 19th, 1936.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, MITCHELL, SHEHAN, and JOHNSON, JJ.

*J. Paul Schmidt,* with whom was *Isaac Lobe Straus* on the brief, for the appellant.

*Israel S. Gomborov,* with whom was *A. David Gomborov* on the brief, for the appellees.

MITCHELL, J., delivered the opinion of the Court.

The appeal in this case arises from an order of the Orphans' Court of Baltimore City, passed on September 23rd, 1935, dismissing the exceptions and petition of Ida Schockett, wherein she prayed that the executors of the estate of Morris Tublin, deceased, be directed to return a modified or corrected list of debts and open accounts due the estate of the deceased, and that the appraisal and return of said debts and open accounts, and a sale thereof theretofore made by said executors, be set aside and declared null and void.

It appears from the record that Morris Tublin died in Baltimore City on January 16th, 1935, leaving surviving him his widow, Rose Tublin, who was his second wife, and three children: a son, Sol Tublin, a daughter, Ida Schockett, children by his first wife, both being adults at the time of his death, and a son, Ira Nathan

Tublin, a child by his second wife, who at said time was an infant of the age of six years.

By his last will and testament, dated December 12th, 1929, and admitted to probate in the Orphans' Court of Baltimore City on January 25th, 1935, he devised and bequeathed to his wife, Rose Tublin, the same share of his estate as she would have received under the laws of the State of Maryland had he died intestate. To his infant son, Ira Nathan Tublin, he next bequeathed a legacy of $3,000. And all the rest and residue of his estate he devised and bequeathed to his three children above named, share and share alike. He appointed his wife and his son Sol Tublin executors of his said last will and testament, to whom letters testamentary were duly granted by the said Orphans' Court.

For a number of years prior to his death, Morris Tublin, the decedent, was engaged in the business of selling dry goods, clothing, and notions on an installment basis. He had no established place of business other than his own home, and conducted the business through personal calls upon his customers at their homes. Through this method he made sales and collected small installment payments from time to time. At the time of his death, such books as he kept indicated an indebtedness due him on open accounts pertaining to his business, and for money loaned to various parties, aggregating $5,871.85. This indebtedness was evidenced by sundry items found in the record, ranging in amount from 25 cents to $145, and due from customers and borrowers of apparently slight, if any, financial responsibility. The record reveals that no itemized accounts of the indebtedness were found among the papers of the deceased, and that the names of the debtors were in some cases incomplete, the surname and street address of the debtor only being recorded; in many cases no name at all was found, but the account was evidenced by a street address and the amount.

Under the provisions of section 219 of article 93 of the Code, unless further time is granted by the Orphans'

Court, executors and administrators are required to return an inventory and appraisement of the personal estate of their decedents, to the Orphans' Court from which letters are issued to them, within the period of three calendar months from the date of the letters; and, upon failure so to do, attachment may issue to enforce the return, the court being clothed with power to fine the delinquent party a sum not exceeding thirty dollars. Section 232 of the same article provides: "Every administrator shall likewise return within the time and under the pain aforesaid, with an affidavit of the truth annexed, an inventory of the money belonging to the deceased which have come into his hands, and a list of the debts due to the deceased which have come to his knowledge, specifying the nature of each debt and setting down such as he shall deem sperate, distinct and separate from those which he shall deem desperate and doubtful."

Varying somewhat from the strict letter of section 232, it appears that the executors of Morris Tublin, on the 15th day of March, 1935, returned to the Orphans' Court, in the form of "a true and perfect additional inventory" of the accounts due the estate, a list of said accounts, under the following designations: "Doubtful"; "cannot locate"; "uncollectible"; "money loaned"; "very slow"; "slow"; and "good." Under the first four designations above set forth, the totals, respectively, are shown to be $331.50, $76.30, $213.55, and $745.50; while under the remaining designations the respective items are not totaled. Following the items so listed, and without recording their sum total, is found the notation: "The above accounts are appraised for $750.00"; and this notation is accompanied by the formal certificate of two appraisers who are shown to have first been legally authorized to make said appraisement and to have taken the oath prescribed by law, as usually found in warrants to appraise the personal estate of decedents.

A correct summary of all the items of the foregoing additional inventory shows a total of $4,846.10; and therefore there is an apparent discrepancy between the

total accounts due the estate, as hereinbefore set forth, as of the date of the death of Morris Tublin, and the total indicated by the foregoing return. This variance is accounted for by Sol Tublin, one of the executors, whose testimony is to the effect that his investigation revealed certain discrepancies between the amounts indicated by the individual accounts and the receipts held by the individual customers; and the further fact that at the time the inventory was returned the executors had collected the approximate sum of $800. It is further shown from the undisputed testimony in the case that the nature of the business of the deceased and the financial status of his customers were such that the greater amount of the indebtedness due him was uncollectible by legal process, and that the more favorable outlook for the ultimate collection depended upon a continuation of the business.

In this connection, Sol Tublin, one of the executors, and a beneficiary under his father's will, who seems to have possessed knowledge of the details of his father's business, testified as follows: "When he classed accounts as 'Good' he felt if he sold them some merchandise he could collect the money. He doesn't think any of these people have any property in their name, he judges they are all of a very poor class of working people and they buy clothes on the installment plan and all of these clothes that were sold them were really gone when he went to collect. The clothes were worn out, it is question of a year or two years before they pay out their bills, and the clothes are gone. Some of the accounts in the books showed an indebtedness for which the people had receipts showing they had been paid. Some of the customers claimed his father promised them a deduction, many of them had the wrong balance. A good many claimed they owed less than what the books showed. His father receipted the cards and never put a signature down, and anybody could put a dollar or so down on the cards. He has no doubt many of them put it in when they learned his father died, but he was in no position to prove it. Some of the customers said he had no proof

that they got these goods and he had no contracts signed by any of the customers. He knows there was not any. He helped his father on Saturdays with the business. His father had no receipts for those goods. As far as his investigation goes the customers are not of financial responsibility, not property owners." His further testimony is to the effect that, since he purchased the accounts pertaining to the estate, he has engaged in the same line of business, and that the only hope of his collecting any appreciable part of the accounts purchased by him lies in his ability to continue to trade with the respective customers involved; in other words, it is indicated from his testimony that the shutting off of credit to customers of this class would force them to seek credit elsewhere and result in their failure to pay their past indebtedness.

As viewed in this light, while the additional inventory deals solely with accounts due the estate, it may, for the purposes of this case, be treated, to all intents and purposes, as an appraisal or valuation of the business of the deceased, as distinct from his other estate; and it is evident that it was not only so considered by the executors and their counsel, but likewise by the petitioner, her husband, and her counsel, at the time of the return thereof. It may be added that the Orphans' Court dealt with the matter from the same view-point, as the record shows that, upon formal petition of the executors, the Orphans' Court passed an order authorizing the sale of the accounts either at public or private sale, with the usual provision that, if sold at private sale, the same would not be sold for less than the appraised value thereof.

It is true that this order was not passed until the 14th day of May, 1935, and that the negotiations which resulted in the sale were tentatively made at an earlier date. These negotiations took place after the appellant's attorney had secured from the attorney for the executors a full list of the accounts, showing totals in some cases, and lacking totals in others, as hereinbefore described; and culminated in a meeting held at the office of the

attorney for the executors, shortly prior to March 12th, 1935, at which the appellant, her husband, and her then counsel were present, and at which both of the executors and their attorney were present. At this meeting the parties interested submitted, as between themselves, bids for an automobile appraised in the sum of $300, and for the accounts at the stated appraisement. Isadore Schockett, husband of the appellant, thereupon bid $300 for the automobile, which was followed by a bid of Sol Tublin, one of the executors, of $350. Mr. Schockett then asked for time in which to consider whether he would raise the price above the Tublin bid, which was agreed to by Tublin. Subsequently Milton S. Goldbloom, the attorney then representing the appellant, wrote to Israel Gomborov, the attorney for the appellees, as follows: "Israel Gomborov, Esquire, 44 Knickerbocker Building, Baltimore, Maryland. Re: Estate of Morris Tublin, deceased. Dear Sir: Kindly be advised that Mr. Schockett will not over bid the cash offer of $350.00, offered for the automobile by Mr. Sol Tublin." Following the bid on the automobile, Mr. Goldbloom submitted a bid of $750 for the accounts, whereupon Sol Tublin bid $775. Mr. Goldbloom further testified that he had no authority to go any higher, but left the meeting with the understanding that, if he wanted to increase the offer, the business would be turned over to whoever he bid for. There is some discrepancy in the testimony of witnesses for the respective parties as to the total amount of the accounts shown at this meeting; and there is also some evidence tending to prove that the accounts were sold subject to the assumption by the purchaser of indebtedness due by the decedent, peculiar to his business. But this latter theory of the sale seems to have grown out of the further theory that the purchaser of the business would receive whatever amount had been collected on the accounts between the date of death and the date of sale. This contention between the parties, however, is, we think, affirmatively cleared up by the testimony of Mr. Goldbloom, as follows: "Q. (by Mr. Gomborov).

At that time, when the offers were bid for those accounts, and Mr. Tublin's offer came in, was it said by myself, or any of the executors, or by any one, that the amount of $750 was to be in addition to the open indebtedness involving some $800? A. No, I remember the original proposition that was made the first time, was to sell the business, the accounts receivable, for $750, and for the estate to pay the bills due on the business. I objected to that, and some time later, when we had the second conference, the amount the estate had already collected equalled approximately what the debts were of the business and it was stated that money would be turned over to the estate, and after that was done, I was satisfied to sell the business to the highest bidder, as far as my client was concerned."

The testimony of the appellant indicates that she did not understand the details of the sale as did her attorney; but it further shows that nothing was done by the executors or their attorney to conceal any information she desired, and, in answer to the question whether she ever asked the executors to allow her to examine her father's books, she replied: "They told me, at any time I wanted to, I could see them, but I did not see them."

Following the report and ratification of the foregoing sale, on May 23rd, 1935, the petition in this case, on June 1st, 1935, was filed.

While, as hereinbefore indicated, the method of dealing with the accounts due the decedent at the time of his death was at variance with the statute, and the better practice is to list the claims as debts of the estate, and designate them as directed by the statute, in the instant case the difficulty of dealing with the particular class and amounts involved in the various accounts shown by the "additional inventory" can be readily conceived. To have followed the statute strictly would have made it incumbent upon the executors to institute a multiplicity of petty suits; and, in view of what has been shown as to the financial status of the debtors and the necessity of a con-

tinuation of the business in order to eventually effect substantial collections on the indebtedness, we cannot say that in the last analysis the action of the executors was not for the best interest of the beneficiaries of the estate. Nor do we find, under the peculiar facts and circumstances incident to this case, that the purchase of the accounts by one of the executors was wanting in *bona fides*. The purchaser was a son of the deceased, who, it may be reasonably assumed, had some knowledge at least of the nature of his father's business and the character and financial ability of the customers with whom he dealt. So far as the record reveals, he was the only available purchaser for accounts of this character. Had he clandestinely sought to purchase them, without first making known to other parties in interest the full facts pertaining to them, we would have no hesitancy, in view of his separate fiduciary relations to all of the beneficiaries of the estate, in ruling adversely to the appellees. But such is not the fact. On the contrary, it is affirmatively shown that the attorney for the executors was zealous in making known to the only adult beneficiary, other than the executors themselves, every detail with reference to the books and accounts of the decedent. There was no clandestine sale; nor was there a public sale; and there was every reason for saving the costs and expenses incident to a public sale, because the very nature of the items sought to be sold was such as not to appeal to an outside purchaser. At the arranged private bidding, not only was the coexecutor purchaser the highest bidder, but, as will be observed, he did not stand on his bid; to the contrary, he accorded opportunity to the appellant, through her accredited attorney, to increase the offer, and agreed to "turn the business over to whoever he bid for."

The appellant's brief, as well as the argument on her behalf in this court, stresses the case of *Handy v. Collins*, 60 Md. 229, as being authority for her contention. In that case William H. Collins, the testator, died possessed of an estate of the approximate value of $181,000, con-

sisting mainly of Baltimore City stock, and two notes due him from his wife's brother amounting to $26,000. His widow was named as sole executrix, and by his will he bequeathed to her, among other things, the two notes above mentioned. After the bequest of a number of other pecuniary legacies, he devised and bequeathed the residue of his estate to four cousins. The executrix, in the course of her administration of the estate, charged herself with the face value of the notes as representing a part of the assets of the estate, and claimed allowance of commissions upon the whole estate, including the notes. The notes were not returned as a part of the inventory of the estate of the deceased; nor were they ever appraised. In order to pay the creditors and close the estate, it was not necessary to collect these notes, and no collection was made of them, or of any part of them; the executrix having passed them to the legatee in their original form. The entire question confronting the court in that case was whether the executrix, without receiving any money into her hands as representing the proceeds of the sale of the specific legacies in the form of the notes, and without subjecting her bond to any liability therefor, could justly claim commissions upon the face of the indebtedness represented by the notes, through the process of including them as assets of the estate and the formality of passing them to the legatee. The controversy in that case was one involving commissions; and we cannot conclude the same as being controlling in the case before us.

The fact that the purchaser in this case was also a co-executor of the estate enlists the careful scrutiny of the court. As was said in the case of *Sessions v. Casey*, 141 Md. 314, 118 A. 759, 760: "The law is well established, upon the soundest ground of equity and public policy, that executors and administrators cannot be purchasers at their own sale of property, which they hold in trust for others. Such sales are voidable, and a court of equity has jurisdiction to vacate and set them aside, at the instance of any one interested in the estate. This rule has been settled and applied, in a number of cases,

in this court. *Conway v. Green's Admr.,* 1 H. & J. 151; *Williams' Excrs. v. Marshall,* 4 G. & J. 376; *Scott v. Burch's Admx.,* 6 H. & J. 67; *Md. Fire Ins. Co. v. Dalrymple,* 25 Md. 242; *Eichelberger v. Hawthorne,* 33 Md. 588." While the case from which the above quotation is taken, and the citations therein made, represent equity appeals before this court, the same reasoning applies in cases dealing with appeals from the Orphans' Court with regard to transactions of fiduciaries. Without in any manner deviating from the unbending rule controlling transactions between fiduciaries and their *cestuis que trustent,* it may be stated as a general principle that each transaction depends upon the peculiar circumstances connected therewith. It will be observed in this connection that the co-executor of the purchaser, who in her own right and as the natural guardian of her infant son represented five-ninths of the estate of the decedent, was present at the time the sale was made, and, with full knowledge of the price offered, gave approval to the transaction, and co-operated to the end that it might be finally consummated. This circumstance, considered in conjunction with the character of the property sold, its value being dependent upon a continuation of the business of the testator, in our opinion justifies a variance from the general principle hereinbefore enunciated. It is our conclusion, therefore, that the order appealed from should be affirmed.

*Order affirmed, with costs to the appellees.*