EDYTHE R. GOLDMAN *v.* BERNARD RUBIN ET AL.

[No. 41, September Term, 1981.]

*Decided February 24, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Thomas Waxter, Jr.,* with whom were *Nora Winay* and *Semmes, Bowen & Semmes* on the brief, for appellant.

*Allan H. Fisher, Jr.,* and *Benjamin Lipsitz,* with whom was *H. Dean Bouland* on the brief, for appellees.

RODOWSKY, J., delivered the opinion of the Court.

This case arises out of a liquidity problem in the administration of the testamentary estate of the founder of a family corporation. In exchange for a note, the personal representatives sold stock from the estate to the issuing corporation, which was controlled by the persons serving as personal representatives, in a transaction designed to qualify under § 303 of the Internal Revenue Code. Because of a conflict of interests the chancellor surcharged the personal representatives on complaint of the petitioner. The Court of Special Appeals reversed. *Rubin v. Goldman,* 48 Md. App. 59, 426 A.2d 961 (1981). Under the facts involved here, where divided loyalty in the transaction necessarily resulted from the provisions of the will, we shall hold that the conflict does not per se constitute a breach of trust. However, for other reasons hereinafter set forth, we shall vacate both judgments below and remand for further proceedings.

The testator, Max Rubin (Max), died September 18, 1973 at age 79, leaving five adult children. His wife had predeceased him. Max had been engaged in the manufacturing of men's clothing. The principal corporation of his enterprise is Max Rubin Industries, Inc. (MRI). There are a number of subsidiary and affiliated corporations. His oldest child is the petitioner, Edythe R. Goldman (Goldman), born April 30, 1920. She has not engaged in the family business. A son, Bernard Rubin (Bernard), was president of MRI before and following his father's death. A daughter, Pearl, has not engaged in the business but is married to Lee Morrow (Morrow), the vice president of MRI before and following Max's death. Another daughter, Mildred, is married to Mannes Greenberg (Greenberg), an attorney, whose ongoing services as secretary of, and counsel for, the family business antedate the testator's death. A son, Seymour Rubin (Seymour), is a practicing physician. The chancellor found that "[f]or many years, there had been great antagonism, acrimony, and hostility between [Goldman] on the one hand, and virtually all other members of the Rubin family on the other."

Business could have been better. As acknowledged by the petitioner, MRI has had cash problems since 1966. Foreign

imports have undercut domestic clothing manufacturers and in periods of recession men's clothing sales decline. The uncertified consolidated financial statements of MRI, including its wholly owned subsidiaries, for the year ending June 30, 1979 reflected a net loss from operations of $3,157.64 on gross sales of $5,149,821.58. There were retained earnings of $262,214.90. At the time of trial in December 1979 the company had temporarily laid off 250 employees, leaving a skeletal office staff.

From a time prior to Max's death the board of directors of MRI has consisted of Bernard, Morrow, Seymour, Greenberg and Samuel L. Silber (Silber). Silber is a member of the bar, a practicing CPA, and has been the accountant for MRI since 1948. In 1973, 6,800 shares of common stock of MRI were outstanding, of which 5,900 were held by Max (86.77%), 400 by Bernard (5.88%), 400 by Morrow (5.88%) and 100 by Greenberg (1.47%).[1] The persons who comprised the board of directors of MRI, with the exception of Morrow, were named by Max to be the personal representatives of his estate and served as such.

Max's last will and testament, prepared after consultation with Greenberg, was dated March 23, 1971. Of relevance here is the interplay between the disposition of the estate's common stock in MRI and the residuary clause. Item VIII of the will creates trusts out of all of the testator's common stock in MRI,[2] 60% for the benefit of Bernard and 40% for the benefit of Pearl Morrow. The will designates as trustees the five persons who also comprise the board of MRI. This common stock bequest was expressly subject to the charge made in Item I of the will, which provides:

---

1. There were also two classes of preferred stock outstanding in MRI. It does not explicitly appear from the record that all preferred stock was non-voting, even though each class was cumulative and carried dividend arrearages of $135,260 as of June 30, 1979. No party has attributed any significance to who held how much of the preferred stock and the personal representatives speak of control in terms of common stock.

2. We follow the lead of the parties in adopting a shortened description of the corpus of the Item VIII trusts. Actually that provision bequeaths the stock of a number of corporations which were later reorganized into MRI, with one exception which no party treats as material.

(a) I direct my personal representatives to pay out of the principal of the Trust created under ITEM VIII . . . (1) any and all estate and inheritance taxes, Federal and State, which may be assessed against . . . any devises and bequests made in this Will . . . it being my intention that such gifts, devises and bequests . . . shall pass in full to the persons entitled thereto, free and clear of such taxes, and that my personal representatives . . . shall not demand contribution toward such taxes from such persons, (2) all of my burial expenses . . . and (3) all administration expenses allowable as deductions to my Estate under Section 2053 of the Internal Revenue Code of 1954.

. . . .

(b) Except as provided in ITEM I (a) above, I direct that my personal representatives shall pay out of my residuary estate passing under ITEM X . . . all of my just debts . . . and all other expenses not payable pursuant to the directions in paragraph (a) of this ITEM I.

Item X bequeathed one-ninth of the residue to Seymour and two-ninths respectively to each of the remaining children, *i.e.,* Goldman, Pearl Morrow, Mildred Greenberg and Bernard.

There was also a codicil, written in longhand by the testator without consulting counsel. It is in the form of a letter dated December 24, 1969 "[t]o all concerned" which was republished and witnessed July 8, 1971. In the codicil Max explained the reasons underlying his testamentary gifts. As to Mildred Greenberg and Seymour he in substance stated that they did not need financial help. As to his other children he said:

(1) I left the bulk of my estate to my son Bernie Rubin. He worked hard and helped me build up my business.

He knows no other trade nor profession has a family and this is the only way he can make a living. He worked hard, conscientious, devoted. *Should the property be divided I fear he would be left at the mercy of others, perhaps the property divided and business destroyed. He would then be the greatest sufferer.*

My conscience would suffer. This [is] his livelihood. This is the only business he knows.

. . . .

(3) My daughter, Pearl, will get the next biggest share. Pearl and Lee will have a goodly share, a business Lee can devote his time diligently and make the business grow. Pearl thought the business should be divided equal between Lee and Bernie. According to Jewish law a son (Bernie) is entitled to receive the biggest share. Bernie has been with me longer and I believe he worked harder and understands the business better. So Pearl should consider herself lucky and adjust her thinking and be grateful to me. She will get the lions share of a business I worked hard to build.

. . . .

(5) Next is my dearly beloved daughter, Edith. My pride and joy. I am worried. At the present time her income is perhaps the smallest. For a long time she thought my estate should be divided between all five children alike. *If I would do that the business would sooner or later be sold or destroyed. Sooner or later there would be nothing left. And Bernie and Lee (Pearl) would be the greatest sufferers because the clothing business is all they know and once a business is destroyed at this age it would be hard to get started.* And so to help out my beloved daughter, Edith, this decision should be carried out faithfully as my will and as a part of my last will. [Emphasis added.]

The codicil then directed that Goldman receive $100 per week for ten years in addition to the other bequests to her. This codicil was not admitted to probate until May 14, 1974, after a written agreement had been reached between Goldman, Max's other children and his personal representatives.

The federal estate tax return reported a gross estate of $648,106.81, based on values at the alternate valuation date of March 18, 1974.[3] Max's 5,900 shares of MRI common were reported at $22.91 per share ($135,169) at March 18, 1974, and at $25.72 per share ($151,748) on the date of death. These valuations represented one-third of book value. The personal representatives' valuation was accepted by the Internal Revenue Service.

In the course of administration cash and certain liquid assets of the estate, which were not specifically bequeathed, were utilized in the payment of the federal estate tax ($137,433.53),[4] the Maryland estate tax and other expenses of administration. In an effort to exonerate the residuary estate from the taxes and expenses described in Item I(a) of the will, and to carry out against the Item VIII common stock the charge of Item I(a) taxes and expenses, the personal representatives effected a stock redemption under I.R.C. § 303, 26 U.S.C. § 303 (1970). Section 303 provided in part:

> Distributions in redemption of stock to pay death taxes.
>
> (a) In general.
>
> A distribution of property to a shareholder by a corporation in redemption of part or all of the stock of such corporation which (for Federal estate tax

---

**3.** The federal estate tax estate included $91,734.55 of life insurance, but it was not part of the probate estate.

**4.** The figure includes interest of $8,306.47. The personal representatives had initially elected to pay the estate tax in installments under I.R.C. § 6166, 26 U.S.C. § 6166 (1970), but, when the interest rate on the deferred obligation was increased, the balance of the obligation was paid in a lump sum.

purposes) is included in determining the gross estate of a decedent, to the extent that the amount of such distribution does not exceed the sum of —

(1) the estate, inheritance, legacy, and succession taxes (including any interest collected as a part of such taxes) imposed because of such decedent's death, and

(2) the amount of funeral and administration expenses allowable as deductions to the estate under section 2053 . . .

shall be treated as a distribution in full payment in exchange for the stock so redeemed.

The effect of a redemption that qualifies under § 303 is to treat the property received by the shareholder on a capital gains basis and not as a dividend.[5]

Most of the details of the redemption were established at a meeting of the personal representatives, other than Seymour, on August 31, 1977 in Silber's office. Taxes, funeral expenses and administration expenses which would fix the ceiling on a distribution under § 303 by MRI were computed to be $203,000. Because MRI was "without adequate funds or resources to fund a redemption of stock," [6] the personal representatives-directors determined that MRI would have to issue a note to the estate for $203,000 in exchange for stock, and that the note would thereafter be distributed to the residuary legatees. The $203,000 figure was used for the note in order to give the residuary legatees the *possibility* of obtaining from MRI the maximum amount subject to § 303 treatment. Determination of the number of shares to be redeemed reflected a number of factors. MRI common stock as at June 30, 1977 had a book value of $34.07

---

**5.** "Congress was motivated to grant this relief by the difficulties an estate in which a large part of the value of the assets was attributable to stock in a closely held corporation might encounter in trying to sell the stock to raise funds to pay death taxes." 1 J. Mertens, *Law of Federal Income Taxation* § 9.107, ch. 9 at 358 (1981 rev. ed.).

**6.** Memorandum of the August 31, 1977 meeting prepared by Silber's firm.

a share.[7] A redemption at book value (assuming the note of MRI really equaled $203,000) would require 5,958 shares. This exceeded the amount of estate-held common stock (5,900 shares). Under a redemption of all of the estate-held common stock "control of the corporation would pass from the Trust to the individuals which would effectively thwart the intentions of the testator."[8] It was decided to allocate the effect of a redemption of 5,958 shares pro-rata over all the outstanding common stock. As a result 5,170 shares of estate common were to be redeemed, leaving it 730 shares (86.70%), and the $203,000 note was to be given exclusively in exchange for the estate stock. Without direct consideration, Bernard, Morrow and Greenberg contributed to MRI 350, 350 and 88 shares respectively, leaving Bernard 50 shares (5.94%), Morrow 50 shares (5.94%) and Greenberg 12 shares (1.42%) in their individual capacities.

By a written agreement dated September 1, 1977 between MRI and the personal representatives, to which the trustees of the Item VIII trusts affixed their consent, the estate sold 5,170 shares to MRI in exchange for a promissory note of MRI in the principal amount of $203,000. The note provides for interest at the rate of 6% per annum, payable annually, on the unpaid balance. No payment on principal is required until the tenth year, by the expiration of which 10% of the original indebtedness is to be paid, and 15% of the original indebtedness is to be paid each year thereafter until payment in full. The obligation represented by the note is "subordinate to any and all liens, debts and obligations now or hereafter owing to any creditor of" MRI. MRI, as maker, agreed to substitute separate notes aggregating the total indebtedness, on the same terms, so as to facilitate distribution by the estate, as holder.

A meeting of the shareholders of MRI, which seems to have been much in the nature of a family meeting, was held

---

**7.** This may be compared to a book value of approximately $77.16 on September 18, 1973, the date of Max's death (3 x $25.72).

**8.** See n.6, *supra.* Instead of the five trustees holding 86.77% of the common, Bernard would hold 44.445% (400 shs.), Morrow 44.445% (400 shs.) and Greenberg 11.11% (100 shs.), in their individual capacities.

on April 26, 1978 at which the redemption, and the reasons for the promissory note, rather than any cash payment, were explained. All interested parties approved the transaction with the exception of Goldman who was not present but whose son, an attorney, attended the meeting as an observer on her behalf. When the personal representatives filed their fifth and final administration account in the summer of 1978, it proposed distributing the $203,000 note among the residuary legatees. Goldman's two-ninths interest in the note was reflected in the account at $29,549.33.[9] The final administration account also proposed distributing $13,363.45 in personal representatives' commissions, after tax on commissions. The orphans' court had previously authorized the distribution of $7,199.05 in after-tax commissions, pursuant to interim accounts. Gross commissions proposed in all accounts aggregated $22,847.23, 10% of which represented tax on commissions, so that total after-tax commissions from all accounts aggregated $20,562.50. A counsel fee to Greenberg and Silber of $27,200 was also included in the account.

In the orphans' court Goldman excepted to the account and to the petitions for commissions and counsel fee. She alleged that the stock redemption was upon terms so unfavorable as to substantially prejudice the residuary legatees, that it was inconsistent with the fiduciary duty owed by the personal representatives, and that it amounted to a frustration of the intention of the testator. She requested that the personal representatives "be directed to reduce the Note to cash in the amount of $203,000 and distribute cash to the residuary legatees." The personal representatives thereupon petitioned the Circuit Court for Baltimore County to assume jurisdiction over the administration of the estate and to grant declaratory relief. They requested a declaration, *inter alia,* that the § 303 redemption resulted from a proper exer-

---

**9.** The final administration account contained an explanation that the promissory note was assigned a fair market value of $132,972, which was equal to the inventory value of the 5,170 shares of common stock redeemed in exchange for the note.

cise of discretion and that the administration account be approved.[10]

The "serious and substantial conflict of interest" of Bernard was a focus of attention by the chancellor. He held that the fiduciaries "were obligated to do their utmost to prevent any detriment to [Goldman]," but that "they did absolutely nothing to attempt to secure the cash for" her and that "[n]othing was done to upset the corporate apple cart." He observed that if the fiduciaries "could not resolve the dilemma by raising the cash, only one alternative remained and that was to resign their fiduciary positions and let the ultimate decision be made by someone who could be completely impartial and without any possible conflicting interest." His decree included a direction that the personal representatives pay $45,111.10 (two-ninths of $203,000) to Goldman, in cash. The commissions and counsel fee were approved and were allowed to the extent there would be cash available in the estate after payment to Goldman.[11]

In reversing, the Court of Special Appeals concluded that there was an implied exemption from the duty of loyalty insofar as the stock redemption transaction was concerned, that there was no allegation or evidence of fraud or bad faith, and that there was no evidence to support a finding of abuse of discretion by the personal representatives. We granted Goldman's petition for certiorari, which asks that we reject any implied exemption and, alternatively, that we hold the evidence sufficient to support the relief granted by the chancellor.

We turn to the issues for decision. Goldman's exceptions to

---

**10.** Goldman filed a counterclaim because the personal representatives had terminated the $100 per week payment to her on the ground that she had allegedly breached the agreement made at the time the codicil was admitted to probate. The chancellor ordered the payments resumed and that issue is not before us.

**11.** We (perhaps loosely) refer to this decree as a "surcharge." It seems intended to be limited to payment out of the funds remaining in the estate, and not to operate as a judgment *in personam* against the four personal representatives, jointly and severally. Its initial effect is to eliminate payment of the counsel fee and of the balance of commissions. Bernard and Seymour had waived commissions in favor of Silber and Greenberg.

the account are filed solely in her capacity as one of the residuary legatees.[12] She does not complain that liquid assets were used to pay estate taxes, funeral expenses and certain expenses of administration. All of the estate expenditures included in the $203,000 were for claims which fall within the four highest priorities of payment under Md. Code (1974), § 8-105 (a) (1) through (4) of the Estates and Trusts Article and were proper. Nor does Goldman claim that a redemption of estate-held common stock of MRI was unauthorized or improper, as such. Her complaint goes to any deferred payment for the redemption, reinforced by this particular note's terms which permit deferral of any payment on principal until she is age 67, and which subordinate payment of principal to present and future corporate debt. She claims entitlement to $45,111.10 in cash, now. To reach that goal her argument essentially consists of four steps: (1) the redemption involved a conflict of interests by the personal representatives; (2) in such cases the burden of proving that there is no breach of duty is on the fiduciary; (3) the personal representatives did not satisfy the chancellor that there was no breach of duty; and (4) the remedy which she has elected, to surcharge the fiduciaries, is appropriate in this case.

The fiduciaries' position is that, although they sold as personal representatives and the stock was bought by the corporation of which they are directors, any conflict of interests was of the testator's creation, and that in such cases the burden of proof is on the beneficiary to show fraud, bad faith or an abuse of discretion, which they say Goldman has failed to do.

I

The personal representatives, in that capacity, held the controlling stock of MRI. Consequently their fiduciary

---

12. We intimate no opinion as to the effect of Md. Code (1975), §§ 2-311 and 2-301 of the Corporations and Associations Article on the redemption transaction in this case.

duties to the legatees, as legatees, apply not only to the administration of the testamentary estate, but also to their action as directors of the buyer in the redemption transaction. *See In re Hubbell's Will,* 302 N.Y. 246, 254-55, 97 N.E.2d 888, 891 (1951); Cahn, *Estate Corporations,* 86 U. Pa. L. Rev. 136, 138 (1937).

This is not a case of self-dealing in the strict sense. MRI was the purchaser. The fiduciaries did not buy for their personal accounts. See Niles, *The Divided-Loyalty Rule,* 91 Tr. & Est. 734 (1952). But it is a case of conflict of interests, at least as to Bernard. In the redemption, the personal interest of Bernard was to keep the price down, so as not to jeopardize MRI and his position as its president, while duty to the legatees made obtaining the best possible price the objective of the fiduciaries.

In step two of her argument, Goldman seeks to have rigidly applied, based on the conflict of interests, the rules applicable to fiduciary loyalty. These are:

> [A] trustee is prohibited from placing himself in any position where his self-interest will or may conflict with his duties as trustee, or from using the advantage of his position to gain any benefit for himself at the expense of the beneficiary of the trust. It is accordingly an accepted rule in equity that the presumption is against the validity of any purchase by a trustee from the beneficiary or any other transaction with the beneficiary which might result in a benefit to the trustee. [*Hughes v. McDaniel,* 202 Md. 626, 632, 98 A.2d 1, 4 (1953) (will made pursuant to contract between settlor of inter vivos trust and trustee left testamentary remainder to trustee individually, and was voided).]

As explained in dicta in *Harlan v. Lee,* 174 Md. 579, 592, 199 A. 862, 869 (1938), the rule has been adopted because "[c]onfidence in the loyalty and impartiality of a fiduciary is not maintained by one who is at once the seller and the buyer of the subject of sale," and because "the danger of

fraud or collusion is so great, and there is such advantage in concealment, and such difficulty of detection, exposure and establishment by evidence . . . ." If self-dealing is involved, "the law does not denounce the sale as fraudulent in fact or make it absolutely void, but voidable on objection by a party in interest." *Id.* But "[n]otwithstanding the importance of the rule and the salutary effect of its rigid enforcement, it is not of universal application." *Id.* The rule does not apply if the purchase is made to protect the interests of the beneficiaries, or if the beneficiaries validly consent, or if they are guilty of laches, "or if the fiduciary be authorized by statute, by the instrument creating the trust, or by the court having jurisdiction of the subject matter, provided the sale be fairly made." *Id.* at 593, 199 A. at 869. And *see McDaniel v. Hughes,* 206 Md. 206, 221-22, 111 A.2d 204, 211 (1955); *Turk v. Grossman,* 176 Md. 644, 665-66, 6 A.2d 639, 650 (1939).

*Harlan*'s facts did not involve self-dealing. An attorney, who was both the executor of an estate and trustee of a trust to which one-third of the estate was bequeathed, had purchased at a public sale, through an agent for himself as trustee, ground rents which he was selling as executor. It was held that the sale was not voidable simply on the election of a legatee. The fact that the attorney both bought and sold was "immaterial" to setting aside the sale because "the purchase [was] not for the private account of the fiduciary, and the reason for the rule ceases, as does its application." 174 Md. at 594, 199 A. at 870. And see *Cosden v. Mercantile-Safe Deposit & Trust Co.,* 41 Md. App. 519, 531-32, 398 A.2d 460, 468, *cert. denied,* 285 Md. 728, *cert. denied,* 444 U.S. 941, 100 S. Ct. 295, 62 L. Ed. 2d 308 (1979).

A sale by a fiduciary to himself as an individual was approved in *Schockett v. Tublin,* 170 Md. 117, 183 A. 521 (1936). There the testator had been engaged, as a sole proprietor, in the business of selling clothing, door to door, on credit to persons of slight, if any, financial responsibility. He collected the small installment payments at the customers' homes. His widow and a son, who had worked to some extent

in the business, were named executors. Records of the accounts were extremely poor. A private sale, by bids, was held of the receivables, which the co-executor-son purchased. His sister sought to set aside the sale, at which she had had an opportunity to bid, but the orphans' court ratified. We affirmed, stating that "[w]ithout in any manner deviating from the unbending rule controlling transactions between fiduciaries and their *cestuis que trustent,* it may be stated as a general principle that each transaction depends upon the peculiar circumstances connected therewith." *Id.* at 127, 183 A. at 525. It was noted that the widow, who individually and as a guardian represented beneficial interests in five-ninths of the estate, had approved the transaction. We said that "[t]his circumstance, considered in conjunction with the character of the property sold, its value being dependent upon a continuation of the business of the testator, in our opinion justifies a variance from the general principle hereinbefore enunciated." *Id.* at 127, 183 A. at 525-26. In the case at bar, seven-ninths of the residuary estate interests approved the sale as structured. Similarly, the values of the stock sold and of the note received were dependent on a continuation of MRI.

Also pertinent is *Gianakos v. Magiros,* 238 Md. 178, 208 A.2d 718 (1965). In that case the intestate and one of his sons were partners in a restaurant business, without any written partnership agreement. The son was appointed by the orphans' court to be personal representative of his father's estate. As surviving partner, the son elected, under the Uniform Partnership Act, to continue the business and to pay to the estate the value of his father's interest in the business as of the date of death. In answer to a contention that the personal representative-surviving partner was precluded from making this election because of a conflict of interest, we said:

> By reason of his court appointment, *in the absence of proof of wrongdoing,* he is authorized to take action which might, under other circumstances, constitute a conflict between his personal position

and his fiduciary capacity. He is, of course, liable under his bond as administrator for any breach of his duty in that capacity .... No intentional wrongdoing by [the son] is claimed.

... By virtue of his position as administrator, [the son] was put to an election under the [Uniform Partnership] Act. The election was necessary by reason of his position, and the position was not only under court order, but also without objection from the [widow]. The attack is made, not because that election was deleterious to [the father's] estate, but merely because it was made. Under these circumstances, the attack must fail. [*Id.* at 186-87, 208 A.2d at 723 (emphasis added).]

Here the personal representatives are not the ones who placed themselves in a position of conflict. They were placed in that position by Max, through the provisions of his will. He appointed as his personal representatives four of the five directors of MRI and then caused the personal representatives to deal with themselves, as directors, and with Bernard as president, as inexorably as if the will had expressly so directed. The will directs that certain types of expenditures by the estate, which in this case total $203,000, are to be paid out of the MRI common stock, without regard to the liquidity of other portions of the estate. We need not in this case speculate on the possibility of the personal representatives converting some or all of the common stock into cash by a sale to a disinterested third party. Max foreclosed any option of selling a controlling interest in MRI. His codicil makes plain his general intent that the business was not to be sold, and that the purpose underlying the Item VIII trust of 60% of his common stock in MRI for the benefit of Bernard was to enable the business to continue under Bernard's day-to-day management as president. It is unrealistic to suppose that an independent third party would pay $203,000 in cash for a minority position in MRI when the stock was not paying any dividends and that price would greatly have exceeded book value. Any market in which

MRI common could be converted into cash with which to restore the residuary portion of the estate was, as a practical matter, limited to MRI itself, or to one or more insiders who might have the necessary personal funds and the willingness voluntarily to expend them in order to retain the existing management.

It is also clear that Max contemplated that the expenditures described in Item I of his will could ultimately be funded by a § 303 redemption. Item I (a) charges against the common stock only those kinds of expenditures which qualify under § 303 in computing the amount of property which can be distributed by the issuing corporation in redemption of its shares and receive § 303 treatment. Indeed, Item I (a) (3) expressly limits the administration expenses portion of the charge on common stock to administration expenses allowable as deductions to the estate under I.R.C. § 2053. Item I (a) (3) thereby tracks the provisions of I.R.C. § 303 (a) (2). A provision similar to Item I (a) in Max's will has been recommended "[i]f it is necessary for dispositive reasons [*e.g.,* control] to bequeath stocks specifically and it is still thought necessary that the stock qualify for redemption under Section 303 (at least in part) . . . ." Leibovitz, *Sections 303, 6166 and 6166A: Liquidity Problems in the Payment of Death Taxes,* 38 N.Y.U. Inst. on Fed. Tax., § 43.02[7] [b], vol. 2 at 43-21 (1980). Because Max's will contemplates that MRI could redeem Item VIII common stock in order to satisfy the charge imposed on that stock by Item I (a), and because Max named the individuals having personal interests in MRI to be his personal representatives, it follows that Max intended those persons to deal with themselves in any redemption transaction.

The question then is whether divided loyalty in this redemption transaction constitutes a breach of duty in and of itself. We think not. The selection by Max of directors and officers of MRI to be his personal representatives may be equated with the appointment of the surviving partner of the intestate as personal representative in *Gianakos v. Magiros, supra,* so that the personal representatives here were

"authorized to take action which might, under other circumstances, constitute a conflict between [their] personal position[s] and [their] fiduciary capacity." 238 Md. at 186, 208 A.2d at 723.

Other courts, faced with analogous situations, have not treated conflicts intended by the testator as breaches of trust. *In re Flagg's Estate,* 365 Pa. 82, 73 A.2d 411 (1950) is in point. There the testator and his son had operated a family corporation. The testator bequeathed all of his common stock (61.46%) in the corporation to his son. Also outstanding was preferred stock, of which the testator owned 87.47%. One-half of this preferred stock was bequeathed outright to the son and the other half to the testator's daughter, in a trust of which the son was a co-trustee. The preferred stock was redeemable on call by action of a majority of the board of directors. When the daughter objected to a redemption from her trust of part of the preferred, the trial court enjoined the redemption solely on the ground of conflict of interests. The Supreme Court of Pennsylvania reversed, and reasoned:

> While the term "self-dealing" sufficiently identifies the rule, it does not define its limitations .... The mere existence of the conflict cannot be allowed to destroy the trust because the testator had the power to specify the terms on which he bequeathed his property. For the same reason that the possible operation of the conflict cannot be allowed to destroy the trust, it cannot be allowed to cut down the effect of the absolute bequests, because, again, the testator had the power to make the bequests. The testator, having the power to do so, created the conflict which became a fact or condition in the administration and devolution of his property to be observed by his executors and trustees. This administration is subject to the scrutiny of the courts, who restrain or otherwise pass on charges of breach of trust. [*Id.* at 87-88, 73 A.2d at 414.]

Responding to an argument that the will did not expressly authorize "self-dealing," the court said:

> There is no proper distinction between express and implied power; where the power, indeed duty, to engage in self-dealing is necessarily implied in the terms of the testator's will the valid exercise of that power will not be set aside by this court. We do not wish to impair the value of the rule against self dealing when properly applied. Testamentary provisions must be given effect notwithstanding the existence of the self-dealing rule; it is not the abstract conflict but the administration that is decisive and administration is subject to the control of the court. [*Id.* at 91-92, 73 A.2d at 416.]

Because there was no fraud or bad faith on the part of the trustees, the redemption in *Flagg* was allowed to proceed.

The rule of *Flagg* was applied in *In re Pincus' Estate,* 378 Pa. 102, 111, 105 A.2d 82, 86 (1954), which held that where a "possible conflict was fully cognizable by the decedent when he wrote his will" and the "conflict was created by the decedent's will," the conflict "would not ipso facto disqualify" the executor from engaging in the challenged transaction and that "[i]n order to effect such disqualification, bad faith on the part of the fiduciary must be affirmatively shown."

Where the will conferred the right on a co-executor to purchase estate-held corporate stock at the value established for federal estate tax purposes, the taking by the estate of an appeal to the Tax Court of the United States in an effort to reduce the valuation, which would diminish the value of the distributive shares to the heirs, was held to be the result of the testatrix's specific intent and not to be a breach of trust. *In re Estate of Vance,* 11 Wash. App. 375, 522 P.2d 1172 (1974). For other decisions recognizing that a conflict of interests which was intended by the creator of the trust is not a breach of fiduciary duty, *see Tankersley v. Albright,* 374 F. Supp. 538, 543 (N.D. Ill. 1974), *aff'd in part* and *rev'd in part,* 514 F.2d 956 (7th Cir. 1975) (trustees of

voting trust proposing to vote stock in favor of amendment concerning structure of board of directors of corporation in which trustees were directors); *Boston Safe Deposit & Trust Co. v. Lewis,* 317 Mass. 137, 141, 57 N.E.2d 638, 640-41 (1944) (Will authorized sale of stock to co-executor at price to be fixed only by him. "[W]here the method selected by a testator for the accomplishment of the purpose and object of the trust cannot be adopted by a trustee without dealing with himself individually, it may fairly be assumed that such dealing was contemplated by the testator."); *Bank of Nevada v. Speirs,* 95 Nev. 870, 603 P.2d 1074 (1979), *cert. denied,* 449 U.S. 994, 101 S. Ct. 531, 66 L. Ed. 2d 291 (1980) (trustee individually acquired additional interests in gambling casino without proportionally increasing trust's fractional holding in casino); *Rosencrans v. Fry,* 12 N.J. 88, 95 A.2d 905 (1953) (co-trustee operating estate corporation given right under will to buy estate-held stock at $25.00 per share; right exercised when surplus had increased by $47.70 per share, with contemporaneous dividend increases of only $3.00 per share); *In re Steele's Estate,* 377 Pa. 250, 257-59, 103 A.2d 409, 412-14 (1954) (distribution of stock dividend to income beneficiary reduced voting strength of corpus, where same person was the life beneficiary, a co-trustee, and a director and officer of the dividend declaring corporation); and *see* G. Bogert, *Trusts and Trustees* § 543 (U), at 373 (rev. 2d ed. 1978).

One writer has summarized the implied exemption from the prohibition against divided loyalty in these words:

> The duties of the trustee in the conduct of the [estate] corporation should be the same whether he owns all of the outstanding shares in trust or part in trust and part in his own right. In the latter situation, the courts are normally willing to presume that the settlor was aware of the potential conflict of interest and condoned its *existence* [citing, *inter alia, Steele* and *Flagg,* both *supra*]. These cases indicate that his conduct may not be questioned *solely* on the ground that he occupies

conflicting positions. It is obvious, however, that a trustee will not be permitted to justify conduct objectionable as a matter of trust administration by a showing that such conduct was necessary to the protection of his personal interests. [Krasnowiecki, *Existing Rules of Trust Administration: A Stranglehold on the Trustee-Controlled Business Enterprise,* 110 U. Pa. L. Rev. 816, 827 n. 50 (1962) (emphasis in original).]

We believe that the implied exemption rule is sound and applies to the facts of the instant matter. Thus, the personal representatives have not breached their trust simply from the fact that one or more of them had conflicting personal interests.

We repeat that this case, in which the redeemed stock is simply being held as treasury stock of MRI, is not one of self-dealing. Today's holding is limited to conflict of interests created by the trustor in transactions contemplated by the trustor.

The effect of this holding is that, in such cases, the burden of proof on the issue of breach of trust is not initially on the fiduciary, because there is no presumption against the fiduciary based on his acting, despite divided loyalty, in the intended transaction. Consequently the burden of proof in this case is as stated in *Lopez v. Lopez,* 250 Md. 491, 501, 243 A.2d 588, 594 (1968):

> [T]he person who challenges the conduct of a trustee, must first allege that the trustee has a duty and has been derelict in the performance of this duty, and offer evidence in support of this allegation. Then, and not until then, does the trustee have the burden of rebutting the allegation. In the absence of such proof, there is no duty on the trustee to prove a negative: *i.e.,* that he has not been derelict in the performance of his duties.

But "[t]he testator's contemplation of the trustee's position of possible divided loyalty does not excuse an actual breach

of a trustee's duty." Niles, *Trusts and Administration,* 28 N.Y.U.L. Rev. 633, 651 (1953).

## II

Goldman further asserts that even if the conflict of interests in a redemption of MRI common stock is not prohibited, the facts of this particular redemption nevertheless constitute a breach of trust. She points to the following findings by the chancellor which she says support his decree, contrary to the determination of the Court of Special Appeals.

> It would have required approximately $45,000.00 in cash to meet Edythe's objection. Whether they were acting in a corporate capacity or as personal representatives, the fiduciaries concluded that this sum could not be raised from the corporate stock. There is no quarrel with the adoption of a stock redemption plan, but the fiduciaries were obligated to do their utmost to prevent any detriment to Edythe and the short answer is that they did absolutely nothing to attempt to secure the cash for Edythe. No effort was made to sell the stock to other members of the family, no attempt was made to raise the money by increasing the mortgage on the corporation's building. No effort was made to borrow the money, using the stock as collateral, and no effort was made to call in the loans that the corporation had made to Bernard Rubin. Nothing was done to upset the corporate apple cart.

As Edythe Goldman views it, a "worthless" note has been substituted for $45,111.10 in cash due to her. We do not see the matter quite so simply.

What happened here is that 5,170 shares of estate-held common stock were sold for a note containing the terms previously described. The sale was made pursuant to the power of sale conferred by § 7-401 (n) of the Estates and Trusts Article and by an express, unrestricted power in the

will. The rule applicable to the exercise of a discretionary power of sale conferred upon testamentary fiduciaries, when exercised under circumstances uncomplicated by divided loyalty, was stated in *Webb & Knapp, Inc. v. Hanover Bank,* 214 Md. 230, 243, 133 A.2d 450, 456 (1957) by quoting from *Gould v. Chappell,* 42 Md. 466, 470 (1875):

> It was their duty, therefore, in making a sale of the property to act in a *prudent and business-like manner,* with a view to obtain as large a price as might, with due diligence and attention, be fairly and reasonably obtainable under the circumstances. In other words, to exercise that diligence and caution which a careful and prudent owner would observe in the sale of his own property. [Emphasis in original.]

And *see Knight v. Nottingham Farms, Inc.,* 207 Md. 65, 76, 113 A.2d 382, 387 (1955); *Kramme v. Mewshaw,* 147 Md. 535, 128 A. 468 (1925). In this case the exercise of the discretionary power of sale by the personal representatives was further circumscribed by the intent of Max that the family business not be sold or liquidated, at least during the business life of his son Bernard. In setting the terms of the sale, the fiduciaries had to exercise their discretion and business judgment to determine, in light of MRI's financial condition, those terms, most favorable to the residuary legatees, which MRI reasonably could pay while still continuing to operate for the foreseeable future. Courts of equity do not interfere in the exercise of the discretionary power conferred on fiduciaries, provided that the power has been honestly and reasonably exercised, "having a proper regard to the wishes of the testator and to the nature and character of the trust reposed in them." *Waesche v. Rizzuto,* 224 Md. 573, 587, 168 A.2d 871, 877 (1961).

In the case at bar the chancellor concluded there was a breach of trust, based on the conflict of interests, without giving recognition to the implied authorization by Max of a redemption transaction. As a result, the chancellor never considered his factual findings in terms of the discretion

vested in the fiduciaries. He recognized that the fiduciaries took the position that MRI could not pay $203,000 in cash and remain viable and found that they "made a decision in favor of maintaining the family business." By emphasizing the conflict of interests, which we have concluded was intended and authorized, the trial court did not reach an analysis of the fiduciaries' position under a standard of discretionary action.

There was a finding that no effort was made to sell the stock to other members of the family, but there was no evidence that any member of the family was a willing and able buyer. There was some general evidence that Bernard was not in a financial position to buy the stock. In any event, the fact finding should be considered in relation to the intent expressed in Max's will that the controlling block of common in MRI be held by the trustees for the benefit of Bernard and of Pearl Morrow, and in relation to the effect of that will provision on the fiduciaries' exercise of discretion.

It was also found by the trial court that no attempt was made to raise "the money" by increasing the mortgage on the corporation's building. At the time of trial the existing mortgage on MRI's building had a balance of approximately $240,000. An appraiser called by Goldman valued the building at $615,000 and expressed the view that its loan to value ratio was in the range of 60% to 80%. Another appraiser, called by the fiduciaries, valued the building at slightly under $300,000. Assuming a loan to value ratio of 80%, the highest figure for which there was supporting testimony, this latter valuation would have excluded any equity for refinancing. This factual dispute was not resolved. If indeed there is some mortgageable equity, the costs of refinancing and of carrying an increased mortgage debt would have to be weighed in light of testimony from the fiduciaries that the $12,180 annual interest on the note actually issued was a substantial burden on MRI.

There was a finding that no effort was made to borrow using the stock as collateral. We cannot make factual determinations on the reality of this alternative. If there is in fact

a loan market for this stock, a decision by the fiduciaries not to go that route needs to be evaluated from a discretionary standpoint in light of the testator's intent that control of the stock be in the Item VIII trust and in light of the risk of a loan default and a consequential transfer of the security to a third party.

The chancellor noted that there were outstanding corporate loans to Bernard of $24,700. (There was also evidence that Morrow owed MRI and a subsidiary approximately $10,000.) Portions of the balances on these loans date back prior to Max's death. The chancellor found that no effort was made to call in the loans by MRI to Bernard. The fiduciaries' position is that there was evidence that MRI could not pay its debts as they matured, that creditors could object if funds paid into the corporation were used to purchase stock for the benefit of stockholders and that in any event the matter was one for the discretion of the directors. All of this evidence and argument needs to be evaluated in the first instance by the trier of fact to determine if there has been any abuse of discretion.

We find it necessary to vacate the judgments below and remand for further proceedings under Md. Rule 871 a. This disposition results from the combination of the factual record, described above, with our conclusion that the legal standards relating to fiduciary discretion are applicable. Our reasons are, perhaps, best shown by first referring to the issue on remand.

The issue in this case is the adequacy of the purchase price of 5,170 shares of MRI common. It should not be viewed as a search for $45,111.10 to be paid to Goldman. Goldman seems to consider that any rights which she might have in the matter are to be measured by two-ninths of the amount of cash which was expended from the residuary estate, as if it would otherwise have gone to her. But that expenditure was for taxes, funeral expenses and administration expenses which enjoy a statutory priority over the gift of the common stock and over the residuary bequests. There was no breach of trust in making those expenditures and Goldman has no

complaint on that score. In determining whether discretion in fixing the terms of sale has been properly exercised or abused, the interests of the other residuary legatees are not to be carved completely out of the case, simply because they have not joined in Goldman's request for relief. The duty to obtain a legally adequate price for the 5,170 shares ran to all of the residuary legatees. Thus the exercise of discretion is to be measured by the $203,000 purchase price for the entire block of stock, and the exercise of discretion in fixing the terms of payment must consider the extent of the ability of MRI to pay that total purchase price, in a manner consistent with Max's intent that the business be preserved. It should be kept in mind that when the fiduciaries effected the redemption, well before the approvals at the shareholders meeting, they were not simply redeeming shares which were charged for the payment of two-ninths of the priority expenses, but for the payment of all of them. Any consideration to be paid for the shares would inure to the benefit of all of the residuary legatees, whom the fiduciaries had to treat equally in making their decision on the terms of sale.

Phrased another way, the position which Goldman has asserted would require a finding that it was an abuse of discretion for the fiduciaries to fail to pay $203,000 in cash for the 5,170 shares, and that the note actually given was worthless, so that the total loss to all of the beneficiaries was $203,000, of which Goldman's two-ninths share is $45,111.10. This result is seemingly an intrinsic contradiction. If the note of MRI were worthless, the fiduciaries could not have abused their discretion by failing to have MRI pay $203,000 in cash.

What is presented here is an entire spectrum of options relating to terms of payment. Theoretically the end most favorable to the legatees is represented by Goldman's position of $203,000 in cash, now. The other end of the spectrum has been fixed by the fiduciaries issuing MRI's 6% interest, 10 years deferral of principal, totally subordinated, installment note. We hold only that this Court cannot say on the present record that it would be clearly erroneous for a fact finder to conclude that the terms of the note actually issued

involved an abuse of discretion and thus we do not affirm the disposition by the Court of Special Appeals. If after further proceedings the chancellor concludes that the note actually issued was not a result of an abuse of discretion, the distribution of that note as reflected in the administration account should be approved.

If the chancellor concludes that the fiduciaries have breached their duty by the terms of the note actually issued, then the spectrum of purchase terms must be examined, moving from that end in the direction of terms more favorable to the legatees, in order to determine the point at which the fiduciaries entered the area of discretion abuse and left the range of its proper exercise. Conceptually, this point could involve some combination of cash and deferred payments, or all deferred payments, but on terms more favorable to the residuary legatees. The compensable loss to the beneficiaries would then be the difference between the present value of a purchase at the outer limit of a proper exercise of discretion and the present value, as of the date of issuance, of the note actually issued. Since Goldman has elected surcharge as the remedy which she seeks, she would, under this hypothesis, be entitled to a decree for two-ninths of the difference.[13]

> *Judgment of the Court of Special Appeals vacated.*
>
> *Case remanded to the Court of Special Appeals with instructions to vacate the decree of the Circuit Court for Baltimore County and to remand the case to that Court for further proceedings consistent with this opinion.*
>
> *Costs to abide the final result.*

---

**13.** Nothing in our analysis of alternative dispositions on remand is intended to intimate that the fiduciaries, acting with the consent of the legatees other than Goldman, would be precluded from substituting some new terms of payment for the stock, prior to hearing on the remand.

Nor does the present note prohibit any prepayment MRI might decide to make.